Madden, Judge,
delivered the opinion of the court:
The plaintiffs, as joint venturers, made a contract with the Government to construct for it three hemp mills at three separate places in Minnesota. The contract price was a lump sum of $301,800, plus unit prices to be paid for work not included in the base bid. The contract was executed on behalf of the Government through the Commodity Credit Corporation, acting on behalf of the Defense Plant Corporation. Both were agencies of the Government.
The contract was dated May 15, 1943. It provided that work should commence V days after the date of the contract, and be completed within 160 calendar days after that date.
*204 The completion date stipulated in the contract was, therefore, October 22, 1943. There was no provision in the contract for the assessment of liquidated damages, and the Government has made no claim against the plaintiffs on account of the late completion. The plaintiffs are here suing the Government because, they allege, it, by its conduct, caused them to be delayed in the completion of the contract, and thereby damaged. They also assert some other claims which will be separately discussed.
Our findings of fact recite the actions and omissions of the Government’s agents which, the plaintiffs assert, caused them damaging delays. They consist of failures to furnish plot plans, grades, and locations promptly, of delays in approving shop drawings and in making decisions about change orders and the acceptance of the plaintiffs’ offers for work changed by such orders.
The contract specifications contained the following provision:
ARTICLE 12. MATERIALS FURNISHED BY OWNER OR AGENT.
No materials, supplies, equipment, labor, services or any other things required for the performance of the work hereunder are to be furnished by the Owner or Agent, unless the specifications otherwise expressly provide. In case the specifications expressly provide that any materials, supplies, equipment, labor, services or any other things shall be furnished by the Owner or Agent, the Owner or Agent, as the case may be, shall use reasonable efforts to furnish the same when required by the Contractor, but neither the Owner nor the Agent shall be responsible for any delay in the furnishing thereof.
We think that this article was intended to relieve the Government from all liability for delays caused by it, at least in the absence of fraudulent or malicious or arbitrary conduct of its agents causing the delays complained of. The language of the article is very broad. It speaks of “materials, supplies, equipment, labor, services, or any other things” to be furnished by the Government. The delays complained of related to matters that were covered by one or more of these words. Although the provision is harsh, we are not at liberty to narrow the construction of it in order to alleviate *205 its harshness. See United States v. Moorman, 338 U. S. 457; United States v. Wunderlich, 342 U. S. 98.
What we have said disposes of the plaintiff’s claims which are grounded upon delays allegedly caused by the Government. We have, however, also considered the claims as if Article 12 were not present in the contract, and on that basis also our conclusion is adverse to the plaintiffs.
As we have said, the original contract completion date was October 22, 1943. The plaintiffs were advised on July 27, 1944, that the three mills were accepted. The plaintiffs claim that the entire period from the former to the latter date was a period of delay caused by the Government, for which they should be paid for their job and main office overhead, travel, equipment rental, and utility expenditures.
Our consideration of the evidence persuades us that there were some instances in which the Government’s slowness in approving drawings, and making up its mind about whether change orders should be given and whether the plaintiffs’ offers for the changed work should be accepted, may have caused some delay in the progress of the work as a whole. But we are also persuaded that other factors for which the Government was not responsible, were the causes of substantial delays. These other factors were abnormal rainfall in the early months of the work, and again at the end; a severe snowfall, making outdoor work impossible for a considerable period; shortages of materials and labor; slowness of the plaintiffs’ plumbing and heating subcontractor in doing his work; delays caused by change orders which were permissible under the contract, even assuming that other change orders, because the total number was excessive, were not permissible causes of delay; and the plaintiffs’ slowness in correcting deficiencies pointed out in check lists, so that final inspection and acceptance could take place.
The plaintiffs have not given evidence from which we might determine, even approximately, how many days of damaging delay to the project are supposed to have resulted from any specific delaying conduct on the part of the Government. They tell us only the completion date as computed under the original contract, and the date of final acceptance. In this state of the evidence, we cannot determine as a fact *206 that the work was wrongfully delayed by the Government, and if we could so determine, we would still not have the remotest notion of how much it was so delayed. If, therefore, Article 12 of the specifications had not been in the contract, our conclusion would still be that the plaintiffs could not recover for the alleged delays upon which they rely.
The plaintiffs assert three other claims, not relating to delays. The first of these is a claim for an extra of $41.70 for a work bench at each of the three mills, a total of $125.10. Our finding 31 shows that, in our opinion, the work benches which the plaintiffs were required to build were no more costly than the plaintiffs should have expected to have to build at the time they entered into the contract, and before they were furnished detailed drawings of the benches.
The second claim not related to delays is for the cost of procuring the cutting of “key seats” in certain shafting at each of the three mills. The Government was required by the contract to furnish the shafting for the transmission of power in the mills. The key seats were slots in the shafting into which square or other rectangular metal keys would be placed, fitting not only into the slots in the shafting but also into matching slots in the pulleys, thus preventing the pulleys from turning on the shafts. The Government’s architect-engineer approved a change order which would have given the plaintiffs compensation for having the key seats cut, but the change order was not approved by the contracting authority, and was not issued, and the plaintiffs therefore were not paid. Article 3 of the specifications, quoted in Finding 33, provides that if the parties fail to agree upon the adjustment in compensation owing to a contractor as a result of a change in the work, the dispute should be settled by arbitration, as provided in article 31 of the specifications, which is quoted in our finding 34. The plaintiffs say that the provision for arbitration is void, citing United States v. Ames, 24 Fed. Cas. 784 (No. 14441); Welch, assignee of McCormick, v. United States, 1 C. Cls. Rep. 1859-60, No. 199, p. 39; 33 Ops. Atty. Gen. 160. We think, however, that the numerous Supreme Court decisions, the latest of which are United States v. Moorman, and United States v. Wunderlich, both cited above, approving the provisions of Article 15 of the *207 standard form of government contract, show that the plaintiffs are wrong. That article provides that, in case of dispute, the decision should be made by the contracting officer, subject to the contractor’s right to appeal to the head of the department, whose decision should be final. That is a sort of arbitration, albeit by agents of one party to the contract. Yet it violates as completely as arbitration by third persons, as provided for in the instant contract, would violate, any doctrine that Congress has consented to have decisions made against the Government only in the Court of Claims. We think, therefore, that the plaintiffs, feeling aggrieved by the refusal to give them extra compensation for having the key seats cut, were required to ask for arbitration of the grievance, which the contract permitted them to do, and that they are not entitled to have it adjudicated here.
Finding 35 shows that two change orders, Nos. 62 and 63, which would have given the plaintiffs additional compensation for work done under winter conditions, were recommended by the architect-engineer, and approved by the Commodity Credit Corporation, but were denied approval by the Defense Plant Corporation and were therefore never issued to the plaintiffs. While the Commodity Credit Corporation, as agent of the Defense Plant Corporation, the owner, might, perhaps, have effectively issued the change orders without submitting them to its principal for approval, it did not do so. If an agent, instead of exercising his power to bind his principal, refers the problem to his principal with a recommendation, it is the principal’s decision, and not the agent’s recommendation, which is effective. For the reason given above in connection with the cutting of the key seats, as well as for the reasons given in our discussion of the problem of delays allegedly caused by the Government, the plaintiffs are not entitled to recover on these items.
The plaintiffs’ petition will be dismissed.
It is so ordered.
Howell, Judge; Whitaker, Judge; and Littleton, Judge, concur.
Jones, Chief Judge,
took no part in the consideration and decision of this case.
*208 FINDINGS OF FACT
The court makes findings of fact, based upon the evidence, the report of Commissioner William E. Day, and the briefs and argument of counsel, as follows:
1. The plaintiffs are joint contractors composed of the George J. Grant Construction Company, a corporation organized and existing under the laws of the State of Delaware, and the Fred E. Comb Company, a corporation organized and existing, under the laws of the State of Minnesota, having their principal places of business at St. Paul and Minneapolis, Minnesota, respectively.
2. On May 15,1943, plaintiffs entered into a contract with the defendant for the construction of three hemp mills (out of a total of forty hemp mills constructed for defendant by various contractors in the Middlewestern States), No. 31 at Sherbum, Minnesota, No. 33 at Mapleton, Minnesota, and No. 36 at Jackson, Minnesota. For each mill the contract and specifications provided for the furnishing of all labor and transportation, and, except as stated under “Equipment Furnished by Owner,” all materials and equipment required for the construction, finishing, and completion of a hemp mill, including the following buildings: Mill complete with steam engine, hemp machines and power transmissions; two-unit hemp drier; boilerhouse, complete with boilers, accessories, breeching and foundation for stack; shop; locker and washrooms; straw storage building; bale storage building, including grading room and women’s washroom; office building and platform scale; also all steam power, heating, ventilating, plumbing, and outside and inside service connections, and all electrical distributing systems; well and water distribution system, outside drainage, sanitary sewer and sewage disposal system; roads, walks, and paths; and all other work and equipment called for in these specifications and shown on drawings, or necessary to complete the plant in satisfactory manner, ready for operation.
The contract price for the three mills was $301,800. This amount was to be adjusted pursuant to a schedule of unit prices not included in the basic bid. The following unit prices apply to work not included in the base bid:
*209 * * *
2. Price per cubic yard of excavation for grading the mill site_________________________________________$0.35
3. Price per ton in place of surface course material for roads-------------------------------------------- 3.15
4. Price per ton-mile for hauling road surface course material more than one mile from nearest usable railroad siding to mill site____________________________ . 15
*****
10. Price per 100 lineal feet for constructing sewage disposal field_______________________________________120.00
*****
The contract was executed on behalf of the defendant through the Commodity Credit Corporation, which at the time involved herein was an agent and instrumentality of the United States, acting for and on behalf of the Defense Plant Corporation, to aid the Government of the United States in the national defense program. It was actually signed by Wallace Ashby, Acting Director of the Hemp Division, Commodity Credit Corporation, acting for and on behalf of Defense Plant Corporation, and countersigned in the following manner:
APPROVED FOR DEFENSE PLANT CORPORATION
H. S. Merrick
The contract and specifications are in evidence, marked “Plaintiffs’ Exhibit I,” and they are made a part hereof by reference.
3. The Commodity Credit Corporation is, and at all times material herein was, a corporation existing under and by virtue of the laws of the State of Delaware as an agent of the defendant. The Commodity Credit Corporation and the Defense Plant Corporation have at all times herein material been agents of the defendant, acting for and on its behalf.
4. Article 1 of the contract read as follows:
The work shall be commenced 7 days after date of the contract and shall be completed within 160 calendar days after date of contract. The work is to be carried to completion with the utmost speed. Before commencing work a definite time schedule shall be prepared by the Contractor and the approval of the Agent ob *210 tained thereto. The Contractor shall comply with this schedule in carrying out the work. * * *
The effect of the above provision was that the work should start May 22,1943, and be completed by October 28,1943.
5. The contract specifications provided in part as follows:
No surveys of sites are as yet available, but plot plan and grades will be furnished when contracts are let. * * * Typical layout is given in Drawing No. 1. Bids are asked on the basis of this typical drawing, assuming all buildings at the same elevation. In some cases buildings may be reversed to fit site. Bids on road grading, hauling, well construction and sewerage disposal field construction will be on a unit price basis, as provided in Bidder’s Proposal Form.
The following tabulation indicates approximate amounts of work for which unit prices are requested, but contractor will be paid for work actually performed:
Grading of mill site_________________________ 2,500 cu. yds.
Surface course material for roads, etc----------- 1,000 tons
Sewage disposal field------------------------- 1,200 lin. ft.
* * * * *
6. The contract specifications further provided in part as follows:
Article 12. Materials furnished by owner or agent.
No materials, supplies, equipment, labor, services or any other things required for the performance of the work hereunder are to be furnished by the Owner or Agent, unless the specifications otherwise expressly provide. In case the specifications expressly provide that any materials, supplies, equipment, labor, services or any other things shall be furnished by the Owner or Agent, the Owner or Agent, as the case may be, shall use reasonable efforts to furnish the same when required by the Contractor, but neither the Owner nor the Agent shall be responsible for any delay in the furnishing thereof.
7. The contract specifications further provided:
2. Equipment furnished by owner. — The equipment listed below shall be furnished by the owner, but, with the exception of roof trusses for use in Iowa and Minnesota, shall be hauled to site by contractor. Hoof trusses for mills in Iowa and Minnesota shall be delivered at mill site by owner.

*211
Equipment Furnished by Owner for Typical Mill

Item

No. per MUI

per Mill (tone)

Roof trusses______________________
Set of 20______ 28
Boilers with accessories____________
Two 200-HP— 40
(In some cases three 125 to 150 HP H. R. T. or one 400 to 500 HP water tube boiler will be substituted.)
Engine___________________________
One 200-HP... 8
Hemp breaks and tow softener______
3 units________ 50
Scutchers________________________
2 pairs________ 20
Driers, including heating coils and fans___________________________
2 units________ 30
Dust and hurds blowers____________
5_____________ 2
Scales and mise___________________
______________ 3
Total Approx. Wt. per Mill— ______________ 181 Equip. Furnished by Owner.
Addendum No. 3 to the specifications provided:
❖ * * * *
Page GI-1, Section 2. — Add to list of equipment furnished by Owner: Beater rack and shaker shown adjacent to tow softener in Drawing 202, Sheets 1 and 2, and two balers. All are to be hauled from railroad siding and installed by Contractor. Anchor bolts, but no special foundations will be required. Total estimated weight of above items, about 2y2 tons.
A 1,500-lb. capacity Dormant scale for the Bale Storage (Drawing 14) and a 15-ton capacity motor truck scale for installation in front of Office (Drawing 1) will be furnished by Owner, but shall be hauled from railroad siding and installed by contractor in accordance with manufacturer’s directions. Contractor shall furnish suitable 8" wooddecking for the truck-scale platform which will be 34 feet long by 9 feet wide. Weigh-beam of 15-ton scale shall be located inside the Office. Manufacturer will furnish supervision for installation of the motor truck scale.
*****
Addendum No. 5 to the specifications provided:
*****
GI-1, Section 2. — Because of restrictions on deliveries of cold-rolled shafting, all shafting for power transmission will be furnished by Owner.
*****
The above constituted the entire list of materials and equipment which was expressly required by the specifica-
*212 tions to be furnished by the owner or its agent. The specifications, paragraph E.-1 relating to roads, provided in part:
Plot plan and grades for each site will be furnished, * * *
Article 8 of the General Conditions provided as follows:
Article 8. Shop drawings.
The Contractor and the subcontractors shall furnish 4 sets of all shop drawings, properly identified, required by the specifications or by the Agent. All shop drawings submitted by subcontractors shall be first checked by the Contractor and corrected before being submitted to the Agent. Approval of shop drawings by the_Agent shall not relieve the Contractor from responsibility for errors or omissions therein. All such errors or omissions must be made good by the Contractor irrespective of any approval by the Agent.
Article 3 of the General Conditions of the contract specifications authorized the owner to make changes in the work. See finding 33 for the text of this article.
8. Plaintiffs furnished the defendant Progress Schedules on the 22nd day of June 1943. These Progress Schedules are in evidence as Plaintiffs’ Exhibits 85, 86 and 87, and are hereby made a part hereof. They show the dates upon which plaintiffs contemplated completing the various parts of the work involved in the contract and, also, the date of the final completion of all the contract work. The Progress Schedules showed that the contract work was to be completed at Mapleton by September 29; at Sherburn by October 6; and at Jackson by October 13,1943.
9. The mill at Sherburn was completed on June 28, 1944; at Jackson on June 23,1944; and at Mapleton on July 1,1944.
10. The contract contained no provision relating to the assessment of liquidated damages.
Article 6 of the General Conditions provides as follows:
Article 6. Delays and extensions of time.
If the Contractor is delayed in the completion of the work due to acts of the Owner or Agent, acts of other contractors in performing a contract with the Owner, fire, floods, strikes, or other casualties beyond the control and without the fault or negligence of the Contractor, the time for completion shall be extended for a period determined by the Agent to be equivalent to the time of *213 such delay. Unless the Contractor notifies the Agent of such delay within forty-eight (48) hours after the delay commences, no extension of time will be granted, provided that extension of time without written request within said period on one or more occasions shall not be deemed a waiver of the provisions of this paragraph.
11. The plaintiffs claim that the defendant caused them to be delayed in the performance of the contract work from October 22, 1943, until July 27, 1944, the date on which the work was finally accepted on behalf of the defendant. Each instance as to which the plaintiffs say they were delayed by the defendant will be discussed separately.
PLOT PLANS
12. The plaintiffs on May 12,1943, received a topographic map of the Jackson, Minnesota, hemp mill site, together with the following letter from the Chief Engineer of War Hemp Industries, Inc.:
Under separate cover I am sending you two prints of the topographic map and two sets of instructions to inspectors for the Jackson hemp mill site. I shall send prints and instructions for Mapleton and Sherburn just as soon as they are available.
The topographic map of the hemp mill site contains a tentative sketch of the building layout. This layout is subject to change and revison pending the actual inspection of the site by a representative of your company, the inspector, and some representative from this organization. Actual construction is not to be started until site selection and layout have been approved by this office. As soon as your company is ready to start operations, will you please notify me and I shall make arrangements to have all parties concerned represented when the actual site is staked out.
There is no evidence of any reply to the above letter, but on May 17,1943, the plaintiffs received a telegram from the same Chief Engineer as follows:
PROCEED WITH CONSTRUCTION WHEN PLOT PLANS ARE RECEIVED AND BUILDING LOCATIONS ON SITES APPROVED THIS OFFICE.
On May 21, 1943, a revised plot plan was received for the Jackson mill site. On May 24, representatives of the plain *214 tiffs and the defendant visited the three mill sites. At Jackson, the defendant’s engineers concluded that in order to allow for better drainage it was desirable to shift the site slightly by turning the group of buildings on an axis. Plaintiffs’ Exhibit 5 shows the manner in which the defendant’s engineers relocated the entire group of buildings at Jackson. This was done in yellow crayon. It showed the location of the septic tank and sewage disposal field as well as the location of the roads. It did not show the finished road elevations.
Representatives of the plaintiffs and defendant also visited the sites at Sherburn and Mapletion on May 24,1943, and on that date site selections were completed as to all three jobs.
The plaintiffs had not at this time been given the road elevations at any of the three sites although they had the general layout of the roads and entrances from the highway. At Jackson the plot plans indicated the location of the sewage disposal system but not the elevations thereof.
Some slight changes were made in the elevations of some of the buildings subsequent to May 24, 1943; the evidence does not show any delay caused by such changes.
The plaintiffs commenced actual construction at Mapleton on June 1, at Sherburn on June 3, and at Jackson on June 7, 1943.
Apart from the road elevations which will be discussed later, the plaintiffs were not delayed by the failure to receive plot plans.
DISPOSAL FIELD
13. On or about September 13,1943, the plaintiffs’ plumbing subcontractor visited each of the three jobs in company with the architect-engineer’s mechanical engineer to determine exact location of plumbing lines, septic tanks and disposal fields. The plaintiffs were notified of this by letter of September 22 and further that revised drawings were being prepared and would be forwarded by the architect-engineer.
The plaintiffs sent the following letter to the architect-engineer on October 6,1943:
We received this morning one print of Plot Plan for each job as mentioned in your letter of the 4th. We trust you will follow these as quickly as possible with additional prints.
*215 We note that each Plot Plan shows the sewer and septic tank location. It does not, however, show the location of the distributing box, and does not show the location or layout of the disposal field. We assume that you will follow this present Plot Plan with additional plans showing the distributing box and disposal field.
Our plumbing contractor is starting work at once on the sewer, and will want to complete his line to the distributing box at the same time. We sincerely trust that you will give us this further information quickly so that all of this outside work can be completed before the weather changes as it certainly will very soon.
*****
cc: Hemp Mills Grant Co.
Note to Jobs: We believe you have a copy of our subcontract with Grudem Bros. According to this contract Grudem is to put in the entire outside sewer work, except that he has nothing to do with the disposal field and he does not build the septic tank or the distributing box. We are to excavate and do the concrete work for both of these structures, and we are to build the disposal field trenches for which we get paid by the foot. We will not know how many feet of disposal field trench we have to put in until Mr. Pinault gives us the information asked for in this letter. You can, however, put in the septic tank now and you can put in the distributing box as soon as they tell us where it goes.
On October 15th, the plaintiffs received the revised plan showing construction details for septic tank and sewage disposal. On October 22, plaintiffs were requested by letter to prepare a proposal covering labor and materials for the sewage disposal field as shown on the above plan. On October 25, plaintiffs submitted a proposal for this work on all three mills. Their letter stated in part as follows:
These proposals are for immediate acceptance, inasmuch as they do not contemplate the performance of this work in freezing weather. We sincerely trust that you will take immediate action on these proposals in order that we may get started with the work at once. The work should be done now, and we cannot be responsible for its being carried over into freezing weather.
The plaintiffs later, however, submitted another proposal and on November 3, were notified by telegram that it was *216 accepted as to the extra work at Mapleton and Sherburn. Plaintiffs were also told in the telegram to proceed at once with the work, and they did so promptly. As to the Jackson mill, the plaintiffs’ proposal was not accepted, and they were advised by telegram of November 13 to construct the sewage disposal field in accordance with the original contract.
Immediately upon the acceptance of plaintiffs’ proposal for the sewerage system for Mapleton and Sherburn on November 3, plaintiffs started work. A record-breaking snowstorm on the 8th and 9th of November stopped the work at Mapleton until the snow could be removed; and thereafter this work was completed by December 12, 1943. Likewise plaintiffs were stopped by a heavy snowstorm at Sherburn, but after the storm they completed the sewerage system work at Sherburn on December 13, 1943.
At the time plaintiffs received instructions with reference to the disposal field for Jackson on November 13,1943, that site was covered with deep snow, as were the other sites, and it was not feasible to do work at that time. So it was postponed until January and finished toward the close of January 1944.
ROADS
14. The contract specifications provide in part:

R. 1 Roads Worh Included

Surfaced roads and paths around buildings shall be provided as nearly as site permits in accordance with Drawing No. 1. Plot plan and grades for each site will be furnished, and contractor will be paid for work actually performed. Construction shall be in accordance with the attached excerpts from “Specifications for Construction of Roads and Bridges in National Forests and National Parks.” * * *
Item 41-1.1 of the attached excerpts referred to above from “Specifications for Construction of Roads and Bridges * * * ” dealing with the preparation of new subgrade provides in part as follows:
This item shall consist of the preparation and conditioning of the subgrade to the full width of the roadbed in accordance with these specifications and in conformity with the lines, grades, and cross section shown on the *217 plans. The item, shall be performed after the earthwork has been substantially completed and all adjacent drains and structures have been completed and backfilled. * * * [Italics supplied.]
Although the plot plans which the plaintiffs had on May 24,1943, at the beginning of the work showed the road layout at the three mill sites, final elevations for the roads were not furnished by the defendant’s architect-engineer until October 6,1943. Plaintiffs wanted to build the roads at the start of the job by doing the rough grading and enough gravelling in order that they might be used for bringing materials and equipment in to the site of the work. The defendant deliberately withheld the final elevations for the roads until October since the roads were to be paid for by the defendant on a unit price per yard for gravel and the necessary grading, and defendant’s architect-engineer did not want the defendant to be faced with the expense of rebuilding the roads after heavy trucks hauling materials and equipment had ruined the roads.
It is customary for a contractor to supply his own temporary roads. The plaintiffs knew or should have known of the specification requirement that the subgrade upon which the gravel surface course was required to be laid was not to be accomplished until the earthwork was substantially completed and all adjacent structures completed and backfilled. The weekly progress reports maintained by defendant’s resident inspectors, which are in evidence as defendant’s exhibits, show that structures adjacent to the proposed roads were not completed before October 6, 1943, the date on which road elevations were furnished.
The plaintiffs commenced grading for the roads at Jackson on October 21,1943, and at Sherburn and Mapleton the following day. The roadwork at all three locations was stopped by the heavy snowfall in the area on November 8th.
At Sherburn and Jackson, much of the grading but only a small amount of gravelling was accomplished by the end of December 1943. Further work was halted by the winter weather. At Mapleton, the gravelling was almost completed in December 1943.
The plaintiffs finished the road work at Jackson on June 23, at Sherburn on June 28, and at Mapleton on July 1,1944.
*218 BOILER HOUSE GROUP
15. By letter of June 9, 1943, plaintiffs were advised that the plans for the boiler houses in the three mills would be changed because of certain changes in the interior arrangements. They were further advised by the same letter that new plans were being prepared and would be sent as soon as possible. On July 6, 1943, the plaintiffs addressed the following letter to the defendant’s architect-engineers.
On a recent visit by Mr. Brunkow and Mr. Pinault at Jackson, Minn., we were asked to hold up work on the construction of the Hurds Bin and the Pump Pit pending the receipt of revised Boiler Room drawings made to suit the type of boiler equipment to be used. As you must realize, this prevents work on the whole rear wing of this building;, since interior walls must be laid up simultaneously with the outside walls to effect proper bonding.
It is imperative that we get this and other information asked for if we are to continue operations at the sites of these projects.
We previously have asked for additional prints of plot plans. We need these. Please send to us as soon as possible 5 prints of each plot plan, showing the latest revisions, and showing the elevations of the crown of the road as it varies throughout its length on each site.
On July 9, 1943, the plaintiffs by telegram requested that boiler foundation plans for Mapleton and Sherburn be expedited. On the following day, also by telegram, they advised that they needed revised boiler room drawings immediately.
On July 19, 1943, the plaintiffs advised the defendant’s architect-engineer by telegram that they had received the revised plan of the boiler house group for Mapleton and Sherburn and requested information as to whether the boiler house plan for Jackson was to be revised, and if so, to furnish such revision promptly. The telegram also asked that boiler foundation plans for all three mills be furnished promptly.
The defendant’s architect-engineer had a resident inspector at Mapleton and also an inspector who had charge of the work at Jackson and Sherburn. Inspection reports were furnished by the inspectors to the architect-engineer. Such inspection reports covering the entire job are in evidence as *219 Defendant’s Exhibits 10, 11 and 12. The inspection reports for June and July, 1943, together with progress photographs in evidence as Plaintiff’s Exhibit 19A-19J, show that revisions in boiler house plans did not cause the plaintiffs to be delayed in the performance of the contract work.
TRANSMISSION EQUIPMENT
16. The mili building houses the mill machinery and equipment to operate that machinery. On May 24,1943, the Chief Engineer, War Hemp Industries, Inc., J. B. Rodgers, advised plaintiffs in writing that they had found it necessary to revise drawings relating to the transmission equipment such as the belting layout, method of driving the hurds conveyor, also the apron drive, stating:
* * * These revisions are on the drafting board and as soon as they are ready for release you will be supplied with copies.
Until the new drawings are ready I suggest that you withhold placing orders for belting and other power transmission equipment.
The foregoing instructions prevented plaintiffs from ordering the transmission equipment and the conveyor equipment which plaintiffs were required to furnish under the contract. This equipment consisted of pulleys, belts, sprockets, clutches, chains, etc.
It was not until late in June that plaintiffs received revised drawings for the transmission equipment. These were the drawings referred to in defendant’s letter to plaintiffs, of May 24, 1943, referred to above, wherein defendant ordered plaintiffs not to order the transmission equipment until these drawings were received. However, these drawings which were received late in June were again revised in July and again in August 1943, so it was not until August 1943, that plaintiffs could order the material for the transmission equipment.
The plaintiffs did not receive the drawings giving the necessary information for the framing for the shafting support until September 15,1943. Plaintiffs had previously ordered the shafting supports as they were shown on the original plans, but the plans given to plaintiffs on September 15 were *220 revised plans, and plaintiffs could not order the material for this shafting support until they received the revised drawings on September 15, at which time they were immediately ordered.
Erection of this framing started as soon as it was received late in December of 1943, and was finished in the early part of the following January.
FOUNDATIONS FOR BREAK AND TOW SOFTENER
17. The original drawings showed small concrete piers and parts of the foundation for the break and the tow softener. The plaintiffs first received the break and tow softener manufacturers’ foundation layout early in June. The defendant on July 22,1943, furnished foundation plans which modified slightly the manufacturers’ drawings. The progress photographs in evidence as Plaintiffs’ Exhibit 19A-19J show that the plaintiffs were not ready to use the revised plans before they were received on July 22,1943.
BREAK DRAG CONVEYOR AND TRENCHES
18. The break drag conveyor is a chain-type conveyor having two chains running parallel to each other with wood strips across to carry the hurds along the concrete trench. Plaintiffs received the drawings for the break drag conveyor on June 30, 1943, and the details for same on July 8, 1943. The first revision of these drawings showed a change from the belt type of conveyor to the chain type.
On August 19, plaintiffs forwarded to defendant for approval shop drawings showing break drag conveyors as revised by defendant and drawings for construction of the break aprons.
On September 4, 1943, plaintiffs received approval from defendant of the shop drawings for the break drag conveyor and trenches which plaintiffs had submitted to defendant for approval on August 19,1943. Subsequently, however, plaintiffs received revised drawings from the defendant with respect to the break drag conveyor.
The drawings which were sent to plaintiffs, showing the break drag conveyor, needed interpretation; and plaintiffs *221 put a man to work to detail that out so that plaintiffs could use it on the job. This was done and plaintiffs submitted these drawings for approval. Eventually these drawings were approved and the trenches, etc., were constructed according to the approved drawings. Later defendant issued a drawing similar to the one submitted for approval; but plaintiffs had already built the conveyor according to the shop drawings approved. Plaintiffs could not construct the trenches until plaintiffs had received these drawings and they were interpreted and approved. The delay in the construction of the break drag conveyor affected all the work that followed. The trenches had to be built first and then the equipment put into the trenches.
DUST BIN
19. The dust hopper or bin is a receptacle for the collection of dust deposited by the dust-removal system. It was erected on a tower located outside the mill building. No drawing showing its construction details was furnished by the defendant until October 22, 1943. The evidence does not show whether the plaintiffs were ready to begin construction of the dust bin earlier than that date.
HURDS AND DUST STSTEM
20. The hurds and dust system is a system of blowers and sheet metal pipes that suck the hurds into the pipe and take them into the hurds room or spill them on the ground just as the blower on a threshing machine does, and the dust removal is similar. The hurds are the refuse from the hemp, like the hhaff in straw. The hurds system is connected with the boiler in that it gets its power from the boiler. The boilers burn the hurds. It was necessary that the dust and hurds system should be installed in sequence with the other contract work. This system, for instance, could not be built until the shafting supports were up. It was required to be erected after the shafting supports. The shafting had to be put up first so that the hurds pipe could be run without interfering with the shaftings.
On May 27,1943, the plaintiffs forwarded shop drawings of the hurds and dust system to defendant’s agent for ap *222 proval. A few days later the plaintiffs were advised that approval was being withheld until the revision of the shafting and belting layout was completed. The plaintiffs wrote many letters asking for approval of such shop drawings, advising of the probability of their sheet metal subcontractor being delayed in the fabrication of the sheet metal.
On September 4, 1943, the plaintiffs received their shop drawings on the hurds and dust system with the approval of the defendant’s architect-engineer. The evidence does not show that the failure of the defendant to approve hurds and dust shop drawings was the cause of any delay to the job as a whole.
exterior hurds pipe supports
21. The supports for the hurds pipes where they came out of the mill building were similar to two upright telephone poles with a cross-arm between them to support the pipe. A change was made in the supports in December 1943, at the Mapleton mill for which the plaintiffs were paid extra. This change had no effect on the time of the final completion of the mills.
DUST ENCLOSURES
22. On November 5, 1943, the defendant’s architect-engineer sent the following letter to the plaintiffs:
We are making a complete study of the method of enclosing the breakers, softeners, and elevator in order to effect a more complete removal of the dust. We hope to have this study completed by the end of this week and we should like to ask that you do not set the dust hoods for the breakers, softener, and elevator until after we have completed this study. There will be no change in the design of the dust hoods except to eliminate the inner hood as we do not feel the inner hood is required when the machine is completely enclosed. We also suggest that if any of the hoods have not been constructed, that your sub-contractor be notified to hold up the work until we notify you to proceed.
On December 6,1943, the defendant’s architect-engineer sent plaintiffs a drawing showing a method of enclosing the breakers, tow softener and elevator, requesting the plaintiffs to submit a proposal for doing the work shown on the draw *223 ing. Apparently the proposal submitted by the plaintiffs was not agreeable to the defendant’s architect-engineer, as the proposal was not accepted and the work was done by others. There is no evidence that the plaintiffs’ work was delayed by this item.
BLAST GATES FOR HURDS AND DUST SYSTEM
23. On June 1,1943, plaintiffs requested approval for the use of a certain type of blast gate manufactured by the Goethel Company. On September 3, approval was refused because the gate was too light for industrial work. On September 10, plaintiffs submitted data on a different type of gate which was approved by defendant on September 16. The fact that the gate was not approved until September 16 had no effect on the time of completion of the work.
CONVEYOR TRENCH DRAWINGS
24. Shop drawings for the conveyor trenches were submitted by the plaintiffs and thereafter, on September 4,1943, were approved by defendant’s agents. The conveyor trenches were concreted and located below the drier building floor and the mill building floor. The evidence does not show that any delay was caused by failure to approve shop drawings earlier than September 4th. The inspection reports, Defendant’s Exhibits 10,11 and 12, indicate on the other hand that the shop drawings were approved at just about the time the plaintiffs were ready to do the work incident to the conveyor trenches.
FEED TABLE
25. Feed tables are tables that stand in the front of the line before the hemp break machine. There are four in each mill. When the hemp comes out of the drier, it is carried to the feed tables and put through the breaks.
The original drawings showed the feed tables to be of wood. About October 11, 1943, the plaintiffs were given a drawing which added a sheet metal covering for the feed tables. A change order was given to the plaintiffs and they were paid for the extra. There is no evidence of any delay as a result of this change.
*224 CTCLONES
26. On December 22, 1943, defendant’s engineer wired plaintiff as follows:
MOVE CYCLONE AT MAPLETON TO LOCATION INDICATED DRAWING 253 SHEET 1 LETTER FOLLOWS.
This order was complied with and plaintiff received an extra for the cost.
DRINKING FOUNTAINS
27. On the Jackson job, the drinking fountain was relocated from where it was shown on the original plans. On October 20,1943, plaintiffs received written instructions from defendant’s architect-engineer, requesting that the drinking fountain located back of the boilers, as shown on the original boiler house drawings, be relocated.
SKY LIGHTS
28. On June 5, 1944, plaintiffs received a letter from defendant’s engineer; dated June 3, requiring waterproofing around the sky lights to be performed by the plaintiffs, that was not required by the original contract. The plaintiffs added the waterproofing, and were paid for it as an extra after receiving a change order.
TRUCK SCALES, FOUNDATIONS FOR BOILERS, SCALES PITS
29. Prior to June 11, 1943, plaintiffs requested from defendant the necessary drawings for the truck scales; and, on that day they were informed by the Chief Engineer, War Hemp Industries, that he f ully appreciated the necessity of having shop drawings for the equipment and setting and foundation plans for the boilers, stating that the drier drawings, scutchers and hemp break drawings were coming in, and they were completing the drawings for the transmission shafting; that orders for the scales had been placed, but up to that time the defendant had been unable to get drawings from the suppliers; that the same situation was true with reference to the steam engine; that they would furnish the *225 drawings to plaintiffs when they were able to get them. Plaintiffs received on July 27,1943, drawing No. 101 showing the scale pit for the Howe scale, and informed defendant by letter of July 27, that there was a floor drain shown in the pit and requested to be advised of the size of the drain and what was to be done for an outlet for this drain as none was shown on the plan. In the same letter, plaintiffs informed defendant that the drawing stated that the details were in accordance with the Howe Scale Company drawing, and made requests for five sets of same. Plaintiffs also received drawings from defendant for the Fairbanks-Morse scale. Upon receiving the latter drawing from defendant, plaintiffs proceeded to dig the pits since the scale pits could not be started until plaintiffs received such drawing from defendant for the Fairbanks-Morse scale. Later, on September 1,1943, with reference to the drain in the scale pit that plaintiffs had referred to in letter of July 27, 1943, defendant’s architect-engineer, Pinault, advised plaintiffs in writing that he was attempting to clear up this matter and should have an answer within a few days, stating:
* * * Where there is a ditch nearby, it might be feasible to install a drain, otherwise I would suggest to eliminate it and install the concrete pit with a view of making it as watertight as practical.
The last scale drawing which defendant furnished to plaintiffs did not show the size of the drain nor where the drain was to be installed in the pit. This was a drawing in accordance with which plaintiffs were instructed to dig and construct a pit. The absence of this necessary information delayed plaintiffs in construction of the pit.
30. The evidence fails to establish the extent of any delays to the contract work as a whole which may have been caused by the defendant. Other factors contributed to the additional time required to accomplish the work over which the defendant had no control. At the beginning of the job the sites of work were wet and muddy from preceding rains, and until toward the end of August 1943, the amount of rain at each construction area was considerably above normal. In the following spring when the road work remained to be finished, abnormal rains again interfered with the work. *226 Shortages of both labor and material, such as concrete blocks, held up work from time to time as shown by the inspection reports. There were substantial delays in the performance of the plumbing and heating work by the plaintiffs’ subcontractor. The plumbing subcontractor started work at the Jackson mill during the week of September 20, 1943, setting the boilers and starting some of the steam lines. Up to January 4,1944, none of the unit heaters or the piping had been installed. On October 1, 1943, the work of installing the boilers at Mapleton was started, followed by some work on the steam lines, and the bricking-in of the boiler was completed on November 22, 1943. The progress report for this mill dated January 5,1944, states “No work has been done on plumbing and heating for over 6 weeks, when the brickwork was finished on the boiler.” The steamfitters arrived at the Mapleton mill on February 5,1944, and had nearly the whole job to install. On March 15,1944, the steamfitters were completing their work and this was tested on March 17,1944.
There were 54 change orders issued under the contract. A reference to the change orders which are in evidence shows that they cover much work not included in the original contract, the performance of which required additional time.
WORK BENCHES
31. The original contract plans showed a line along one wall of each shop building with a note indicating a work bench. The plaintiffs thereafter received a detailed drawing for the work benches. The plaintiffs claimed an extra of $41.70 for the work benches at each of the three mills, or a total of $125.10. The defendant’s architect-engineer approved the issuance of the change order; but it was not approved by the Defense Plant Corporation and therefore was not issued. The work bench constructed by the plaintiffs at each mill according to the detailed drawing referred to above was 49y2 feet long (3 feet 4 inches shorter than shown on original drawing), three feet wide, with legs of 4 x 4’s and the top of 2-inch planking. Such a work bench was no heavier and no more costly to build than might reasonably have been expected in the shop buildings.
*227 KEY SEATS IN SHAFTING
32. The contract provided that the defendant would furnish the shafting for the job. When it arrived at the job it was not provided with key seats. In order to affix pulleys it was necessary that such key seats or slots be cut in the shafts, and the plaintiffs had it done at a cost for the three mills of $81.58. A change order was requested as to this item by the plaintiffs, and its issuance was approved by the defendant’s architect-engineer, but it was disapproved by the contracting authority and therefore was not issued.
33. Article 3 of the General Conditions of the contract specifications provides as follows:
Article 3. Changes.
The Owner may, at any time, by a written order, and without notice to the sureties, make changes in the drawings and specifications, omit certain work and require additional work to be performed by the Contractor. If such changes, omissions and additions shall materially affect the amount of the work, or the time required in its performance, or shall increase or decrease the cost of the work to the Contractor, an equitable adjustment shall be made. Any change in the contract price necessitated by such changes shall be made by one or more of the following methods acceptable to the Owner.
(a) By a lump sum proposal acceptable to the Owner.
(b) By the unit prices, if any, set forth in the Contractor’s proposal incorporated in the contract.
(c) By adding (1) an amount equal to the actual cost of all labor and materials required to perform such work, and Contractor will be required to take all available discounts, (2) an amount equal to 15% of “(1)” representing profit and overhead and (3), an amount equal to the cost of additional insurance, if any (including workmen’s compensation), and taxes, incurred in the performance of such work. Notice of any claim for adjustment under this Article must be given in writing to the Owner and the Agent within ten (10) days from the date the change was ordered, provided that the Owner, without thereby waiving this provision, may consider any such claim prior to completion and acceptance of the work. If the parties fail to agree upon the adjustment to be made the dispute shall be determined by arbitration as provided herein, but nothing provided in this Article shall excuse the Contractor from proceeding with the *228 prosecution of the work so changed. If any extra, additional or different work be executed by the Contractor without previous written order given by the Owner, no charge will be allowed.
34. Article 31 of the General Conditions of the contract specifications provides as follows:
Article 31. Arbitration
In the event of any disagreement arising under this contract it shall be submitted for determination by arbitrators, in which event the arbitrator to be appointed by the party giving the notice of arbitration shall be given in the notice, the arbitrator to be appointed by the other party to the arbitration shall be named within five (5) days of receipt of such notice of arbitration, and an additional arbitrator shall, within five (5) days of the appointment of the second arbitrator, be selected by the two arbitrators theretofore appointed, but if one of said parties shall have failed to appoint an arbitrator the sole arbitrator shall arbitrate the question alone. If two arbitrators shall have been appointed by the respective parties to the arbitration and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the senior judge of the federal court for the district in which the work is being done upon application by either of said parties to the arbitration. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator, the decision of the sole arbitrator shall be final and binding upon both parties. Each party shall pay the cost and expenses of the arbitrator it selects but the cost and expense of the third arbitrator and the remainder of the expenses of the arbitration shall be borne equally between the parties hereof. The arbitrators, or the sole arbitrator, as the case may be, shall give prompt notice in writing to each party of their decision on or before ten (10) days after the submission of such questions to them for their decision.
Neither the plaintiffs nor defendant gave notice of arbitration or appointed an arbitrator to decide the disagreements presented by the claims involved herein, or any of them.
UNAPPROVED CHANGE ORDERS 62 AND 63
35. The plaintiff submitted proposals to the architect-engineer covering items which it claimed due to the additional cost of construction for work performed under winter *229 conditions. The architect-engineer recommended to the Commodity Credit Corporation approval of certain items contained in such proposals. Following such recommendation, Change Order No. 62, dated February 24, 1945, in the amount of $827.32, was prepared in the office of and executed by an officer of the Commodity Credit Corporation. It was thereafter forwarded to the Defense Plant Corporation for its approval, but it was never approved by the Defense Plant Corporation, and the change order as prepared was never sent to the plaintiff for acceptance.
Similar proposals were submitted by the plaintiff and approved by the architect-engineer, resulting in the preparation by the Commodity Credit Corporation of Change Order No. 63, dated February 24,1945, in the sum of $524.54, covering additional cost due to work performed under winter conditions. This change order was executed by an officer of the Commodity Credit Corporation and forwarded to the Defense Plant Corporation, but was never approved by that corporation and likewise was never forwarded to the plaintiff for its acceptance.
Article 1 of the General Conditions of the contract specifications provided that:
(a) Owner, as used herein, shall mean the Defense Plant Corporation and its duly authorized representatives.
* * sfc # #
(d) Agent, as used herein, shall mean the Commodity Credit Corporation, acting for and on behalf on [sic] the Owner.
36. The parties have agreed that if the plaintiffs are entitled to recover for all delay from October 22, 1943, until July 27,1944, the day on which all of the work was accepted, the plaintiffs are entitled to recover in the following amounts:
Supervisory job site expenses subsequent to October 22,
1943_________________________________________________$9,542.73
Traveling expenses after October 22, 1943________________ 765.85
Equipment rental after October 22,1943__________________ 1,903.66
General office overhead, from October 23,1943, to and including July 26, 1944_____________________________________18,831.60
Telephone expense_____________________________________ 19.34
Electrical service_______________________________________ 160.25
*230 37. The parties have agreed further that if the plaintiffs are entitled to recover on the item of work benches, the amount should be $125.10.
As to the item of key seating, the parties have agreed that if the plaintiffs are entitled to recover, the amount of recovery should be $81.58.
CONCLUSION OF LAW
Upon the foregoing special findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiffs are not entitled to recover, and their petition is therefore dismissed.
Judgment is rendered against the plaintiffs in favor of the United States for the cost of printing the record herein, the amount thereof to be entered by the clerk and collected by him according to law.