**AKTIEBOLAGET BOFORS**

v.

**The UNITED STATES.**

**No. 206–53.**

United States Court of Claims.
July 12, 1957.

Mr. C. E. Rhetts, Washington, D. C., for plaintiff. Messrs. Lawrence J. Latto and Richard T. Conway, Washington, D. C., were on the briefs.

Mr. Kendall M. Barnes, Washington, D. C., with whom was Mr. Asst. Atty. Gen. George Cochran Doub, for defendant.

Mr. Thomas J. Lydon, South Portland, Me., on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

The plaintiff sues for damages for an alleged breach of contract by the United States. It made a contract with the United States on June 21, 1941, licensing the United States to "make, use and have made in the United States" a type of 40 mm. anti-aircraft gun which the plaintiff had developed. It claims that its contract, properly interpreted, contained an agreement on the part of the United States not to export such guns

and thus compete with the plaintiff's interest in selling guns, or licenses to manufacture them, to other countries.

■ As we have said, the contract was made in 1941. The exporting of the guns by the United States began in 1942 and has apparently continued down to recent years. The plaintiff's original petition was filed on May 15, 1953. The Government says that the cause of action is barred by our six-year statute of limitations. The plaintiff says that, in any event, its cause of action for such export of guns as occurred not more than six years before the filing of the petition is not barred. We think the plaintiff is right. The agreement not to export, if we conclude that there was such an agreement, was without limit of time, and each act of violation, whenever it occurred, would constitute a violation of the agreement. There would be no way to measure, at any given time, the total damages which might result from violations then past and those which might occur in the future, and thus include them all in one suit.

■ The contract contained an agreement to arbitrate disputes which might arise under it. The instant dispute as to the meaning of the contract arose in 1942. Not until May 23, 1947 did the plaintiff request arbitration. That request was promptly rejected by a letter from the General Counsel of the Navy Department "in view of the absence of authority of an executive agency of the Government to consent to the resolution of disputes by arbitration." The plaintiff says that its right to sue did not arise until its request for arbitration had been rejected, and that its suit filed within six years after that rejection is effective for all breaches of the contract, whenever they occurred.

The Government says that the running of the statute of limitations was not affected by the arbitration provision. We think the Government is right. The arbitration agreement is a provision for extrajudicial resolution of disputes, analagous to administrative remedies which are often available. A party may be barred from suit for failure to exhaust such remedies, but normally, the statute of limitations runs while he is pursuing them. In the case of arbitration agreements, with no time limit, it would be intolerable that a party should prevent the statute of limitations from even beginning to run, merely by delaying his request for arbitration.

■ The plaintiff says that the Government's refusal, in 1947, to arbitrate was a breach of contract, and that the instant suit includes that breach and is therefore timely, since it was filed within six years after that refusal. Whether the agreement to arbitrate was invalid, as the General Counsel of the Navy Department wrote, or not, we do not decide. See George J. Grant Construction Co. v. United States, 109 F.Supp. 245, 124 Ct.Cl. 202. Even if valid, we think its breach does not give rise to a cause of action against the United States. In the absence of special circumstances such as that one has been misled, to his damage, by the repudiation of an agreement to arbitrate, the only effective judicial remedy for such a refusal is a decree for specific performance. That remedy is not available against the United States, since it has not consented to such suits. A suit for damages for the violation of an agreement to arbitrate can, in the absence of the special circumstances above referred to, result in no more than the award of nominal damages, since a court cannot know what arbitrators would have decided, if there had been arbitration. The cases in this court in which contracting officers have failed to make decisions entrusted to them by Government contracts are not in point. The court decides those cases on their merits, not as it surmises that the contracting officer would have decided them, if he had decided them. The plaintiff must seek the contracting officer's decision in order to exhaust his available extrajudicial remedy. But his recovery here, if any, is based on the substantive provisions of the contract, and not on the refusal to arbitrate.

Our conclusion then is that the plaintiff's suit is not barred by the Statute of Limitations, 28 U.S.C.A. § 2501, but recovery, if any, may be had only for violations of the alleged agreement which occurred not more than six years before the filing of the petition.

We now consider the contentions of the parties as to whether there was, in fact, an agreement by the United States that it would not export Bofors type guns.

The wording of the contract as signed was agreed upon after preliminary events and negotiations, which will be described only briefly in this opinion. American Army officers witnessed a demonstration of the Bofors gun at the plaintiff's plant in 1937. In that year the plaintiff was asked by our military attaché in Berlin to quote prices on a quantity of the guns and ammunition. The plaintiff suggested that our War Department purchase a license to manufacture the guns in the United States. The War Department advised the plaintiff in 1938 that it did not care to do that. In the fall of 1939 the Bofors gun was called to the attention of the Chief of the Bureau of Ordnance of our Navy, by a person who had seen the gun fired in Sweden. In 1940, that official decided to obtain one of the guns, with ammunition, for testing purposes. In 1940 a gun was purchased, for $40,000, and 3,000 rounds of ammunition at $10 each. The contract provided that it did not grant to the United States a license to manufacture the gun or have it manufactured, and that the gun would be used only for testing purposes. The gun was so used in October 1940.

In August 1940, two officers of the Bureau of Ordnance of the Navy were sent to the West Indies to witness the firing of Bofors guns on a Dutch ship. They made a favorable report on the gun, but an unfavorable report on its fire-control system. Following the report of these officers, and the test-firing of the purchased gun, the Bureau of Ordnance of the Navy decided, in effect, to adopt the Bofors gun in place of the 1.1 inch gun which had been developed by the Navy itself, and initiated procedures looking toward the manufacture of the Bofors gun. It obtained from Dutch authorities prints of drawings of the gun. These prints were made from drawings furnished by the plaintiff to the Government of the Netherlands before the German occupation. The set of prints so obtained was virtually complete, and from them the Navy was able to undertake the manufacture of the gun.

The drawings needed some changes, to adapt them for mass production, and such changes were made. The Bureau of Ordnance was not satisfied with the plaintiff's mount for the gun, and a drastically different mount was developed. In 1941 a contractor began to manufacture the guns for the Navy. Early in 1941 the Navy obtained from a British source some drawings of the Bofors gun. It made no use of these drawings because its reworking of the prints it had obtained from the Dutch gave it all the material it needed.

In 1940 the British suggested to our Army that it cause Bofors guns to be manufactured in the United States for the Army. The Army was already procuring, on a quantity basis, another gun developed by itself, but when the Navy adopted the Bofors gun, the Army did likewise. It obtained a complete set of blueprints of the gun from a company in Canada which was manufacturing the gun for the British. These were based upon drawings which had been furnished to the British Government by the plaintiff. Contracts were made early in 1941 with American manufacturers for the manufacture of Bofors guns for the United States on a quantity basis.

On January 10, 1941, while our military authorities were in the process of arranging for the manufacture of the Bofors gun, the Bureau of Ordnance of the Navy requested our naval attaché in Sweden to find out what the plaintiff would charge for a license to have the Bofors gun manufactured in the United States "for use by United States forces only." The plaintiff sent a Captain Lin-

den to Stockholm to confer with our naval attaché. After conferences, Linden returned to Bofors and came back to Stockholm with a draft of a proposed contract. This draft said "this license to be used exclusively for the requirements of the Navy of the United States of America." Our naval attaché suggested that the draft be changed because the Army might also desire to use the gun. Linden agreed that the change would be made. Our naval attaché advised the Navy Department that the cost of a license, with drawings and the services of a production expert and a design engineer would be $600,000.

Exchanges of messages relating to price and time of performance and having no direct bearing on our problem took place. On June 3, 1941 the Navy Department authorized the naval attaché to purchase an "irrevocable non-exclusive license to make, have made, and use in the U. S." the Bofors gun, ammunition and mounting. The attaché prepared a draft which used the language quoted above and further stated that the gun with a specified mounting was to be for naval use, and the gun with a specified field carriage was for Army use. Conferences between the naval attaché and Linden occurred. Linden said that the plaintiff would insist on limiting the license to manufacture for the military forces of the United States. He suggested that the wording be changed to limit the use to the Army and Navy of the United States. The naval attaché said that there might be other organizations such as home defense units or air forces that would be interested in the guns.

About June 10 Linden submitted a proposed draft of contract which said that the license was to cover the manufacture of the material "in the United States for the United States forces." The naval attaché advised the Department of this language and of other terms of the proposed contract and asked if they were acceptable. The Department replied:

"* * * the terms stated are satisfactory except for the limitation as to use by United States forces. It is agreeable that license be limited to manufacture under United States contract and for United States use but not that such use be restricted to forces of the United States."

In a subsequent conference our naval attaché advised Linden that the expression "for the United States forces" used in the draft was not satisfactory to the Navy, and that it had particularly specified that the use of the material manufactured under the license was not to be restricted to the forces of the United States. He suggested that the phrase "for the United States use" be substituted. There was extended discussion of what the substituted expression would mean. Linden said that the export of Bofors guns manufactured in the United States could not be allowed, as it was the plaintiff's policy, in selling manufacturing rights, to limit such rights to the country purchasing them, except that the United Kingdom had acquired a manufacturing license for the entire British Empire.

After the conference the final draft of the contract was prepared by our naval attaché and it was signed on June 21, 1941 by him and by Linden, for their respective principals. It contained the expression "for the United States use." In the latter months of 1941 the United States began to supply other countries with Bofors guns, under its lend-lease program. It has, apparently, continued since that time to export these guns. The instant proceeding is, by the stipulation of the parties, limited to the question of the right of the plaintiff to recover, and hence no evidence has been taken on the question of the extent of the alleged violations.

From the above recital it will be noted that the Navy's first inquiry was about the cost of a license to manufacture "for use by United States forces only." The plaintiff's draft in response said

"exclusively for the requirements of the Navy." Our attaché said that the Army should be included, and the plaintiff's agent agreed. Then for many weeks the negotiations related only to other terms of the contract. Next came our attaché's draft using the expressions "for naval use" and "for Army use" with regard to the guns with their two kinds of accessories. Linden said the plaintiff would insist that the material be limited to the use of the military forces of the United States. Our attaché said it should also include home defense units, air forces, and other possible forces. Linden submitted a draft saying "for the United States forces." Our attaché submitted this to the Department, and received the reply which we have quoted. then the language suggested in the reply, i. e., "for the United States use" was inserted, but only after a discussion in which the plaintiff's agent made it plain that the plaintiff would not agree that the guns might be exported, and in which the agent of the United States expressed no opinion that the language used would permit export.

In no stage of the negotiation, except the final one, was there any intimation by the United States that it contemplated a license to do anything with the material manufactured, except to have it used by its armed forces. Its own first proposal was "for use by United States forces only." Its agent was made aware of the importance which the plaintiff attached to the matter of licensing the export of its guns. When the Department's last proposal reached our agent, it suggested language which was highly ambiguous. One needs only to read the briefs in this case to be convicted of that. The plaintiff's agent stated, in effect, that the plaintiff would not agree to it if it were to be interpreted to mean that the license permitted export. The Government's agent did not say that it did mean that. He had no instructions from his superiors as to what it had been written to mean.

In the circumstances, the meaning which the plaintiff attached to the language is controlling. If parties are at the signing of a contract, and one says that he will not sign except upon the understanding that the word white, when used in the contract, means black, and the other party says nothing, and they sign, probably white means white. But where one party says that the words "for the United States use," speaking of an implement of war, does not mean to him, "for use by any nation at all, if that use will redound to the benefit of the United States," he is properly putting his interpretation upon language which has no plain meaning, and the other party is, in all fairness, under a duty to express his views if they are different. The probability in the instant case is that our naval attaché had no clear idea of what his superiors meant by the language; there was nothing in his prior communications with them which enlightened him; the negotiations had been long and tedious; and the plaintiff's interpretation of the words, in the circumstances, was not unreasonable.

■ Our conclusion is that the United States did not, by the June 21, 1941 contract, obtain a license to export Bofors guns and that, in the circumstances, by necessary implication, it agreed that it would not export them.

The Government says that, because it made no use of the drawings received from the plaintiff, the plaintiff cannot recover, regardless of the meaning of the contract. It is true that so much progress had been made toward the production of the Bofors gun from the data obtained from the Dutch and the British that no use was made of the drawings. The defendant suggests that it bought the license to ward off possible suits for patent infringement after the war. The plaintiff had no American patent on the gun, but it had such a patent on the field gun carriage. Also, there was a possibility that under an international convention, its Swedish patent might become retroactively effective in this country.

■■ We think that one cannot, with full knowledge of the title of the licen-

sor, and of all relevant facts as to whether the license is necessary or valuable, make a contract for the license and then assert that the licensor had nothing to sell. The Government got what it principally desired, immunity from liability to the plaintiff for actions within the scope of the contract. It must therefore itself comply with the contract.

The plaintiff is entitled to recover, and a judgment to that effect will be entered. The amount of the judgment will be determined in further proceedings pursuant to Rule 38(c), 28 U.S.C.A.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.