MaddeN, Judge,
delivered the opinion of the court:
The plaintiff sues for damages for an alleged breach of contract by the United States. It made a contract with the United States on June 21, 1941, licensing the United States to “make, use and have made in the United States” a type of 40 mm. anti-aircraft gun which the plaintiff had developed. It claims that its contract, properly interpreted, contained an agreement on the part of the United States not to export such guns and thus compete with the plaintiff’s interest in *644 selling guns, or licenses to manufacture them, to other countries.
As we have said, the contract was made in 1941. The exporting of the guns by the United States began in 1942 and has apparently continued down to recent years. The plaintiff’s original petition was filed on May 15, 1958. The Government says that the cause of action is barred by our six-year statute of limitations. The plaintiff says that, in any event, its cause of action for such export of guns as occurred not more than six years before the filing of the petition is not barred. We think the plaintiff is right. The agreement not to export, if we conclude that there was such an agreement, was without limit of time, and each act of violation, whenever it occurred, would constitute a violation of the agreement. There would be no way to measure, at any given time, the total damages which might result from violations then past and those which might occur in the future, and thus include them all in one suit.
The contract contained an agreement to arbitrate disputes which might arise under it. The instant dispute as to the meaning of the contract arose in 1942. Not until May 23, 1947 did the plaintiff request arbitration. That request was promptly rejected by a letter from the General Counsel of the Navy Department “in view of the absence of authority of an executive agency of the Government to consent to the resolution of disputes by arbitration.” The plaintiff says that its right to sue did not arise until its request for arbitration had been rejected, and that its suit filed within six years after that rejection is effective for all breaches of the contract, whenever they occurred.
The Government says that the running of the statute of limitations was not affected by the arbitration provision. We think the Government is right. The arbitration agreement is a provision for extrajudicial resolution of disputes, analagous to administrative remedies which are often available. A party may be barred from suit for failure to exhaust such remedies, but normally, the statute of limitations runs while he is pursuing them. In the case of arbitration agreements, with no time limit, it would be intolerable that a party should prevent the statute of limitations from even *645 beginning to run, merely by delaying his request for arbitration.
The plaintiff says that the Government’s refusal, in 1947, to arbitrate was a breach of contract, and that the instant suit includes that breach and is therefore timely,- since it was filed within six years after that refusal. Whether the agreement to arbitrate was invalid, as the General Counsel of the Navy Department wrote, or not, we do not decide. See George J. Grant Construction Co. v. United States, 124 C. Cls. 202. Even if valid, we think its breach does not give rise to a cause of action against the United States. In the absence of special circumstances such as that one has been misled, to his damage, by the repudiation of an agreement to arbitrate, the only effective judicial remedy for such a refusal is a decree for specific performance. That remedy is not available against the United States, since it has not consented. to such suits. A suit for damages for the violation of an agreement to arbitrate can, in the absence of the special circumstances above referred to, result in no more than the award of nominal damages, since a court cannot know what arbitrators would have decided, if there had been arbitration. The cases in this court in which contracting officers have failed to make decisions entrusted to them by Government contracts are not in point. The court decides those cases on their merits, not as it surmises that the contracting officer would have decided them, if he had decided them. The plaintiff must seek the contracting officer’s decision in order to exhaust his available extrajudicial remedy. But his recovery hei’e, if any, is based on the substantive provisions of the contract, and not on the refusal to arbitrate.
Our conclusion then is that the plaintiff’s suit is not barred by the statute of limitations, but recovery, if any, may be had only for violations of the alleged agreement which occurred not more than six years before the filing of the petition.
We now consider the contentions of the parties as to whether there was, in fact, an agreement by the United States that it would not export Bofors type guns.
The wording of the contract as signed was agreed upon after preliminary events and negotiations, which will be *646 described only briefly in this opinion. American Army officers witnessed a demonstration of the Bofors gun at the plaintiff’s plant in 1987. In that year the plaintiff was asked by our military attache in Berlin to quote prices on a quantity of the guns and ammunition. The plaintiff suggested that our War Department purchase a license to manufacture the guns in the United States. The War Department advised the plaintiff in 1938 that it did not care to do that. In the fall of 1939 the Bofors gun was called to the attention of the Chief of the Bureau of Ordnance of our Navy, by a person who had seen the gun fired in Sweden. In 1940, that official decided to obtain one of the guns, with ammunition, for testing purposes. In 1940 a gun was purchased, for $40,000, and 3,000 rounds of ammunition at $10 each. The contract provided that it did not grant to the United States a license to manufacture the gun or have it manufactured, and that the gun would be used only for testing purposes. The gun was so used in October 1940.
In August 1940, two officers of the Bureau of Ordnance of the Navy were sent to the West Indies to witness the firing of Bofors guns on a Dutch ship. They made a favorable report on the gun, but an unfavorable report on its fire-control system. Following the report of these officers, and the test-firing of the purchased gun, the Bureau of Ordnance of the Navy decided, in effect, to adopt the Bofors gun in place of the 1.1 inch gun which had been developed by the Navy itself, and initiated procedures looking toward the manufacture of the Bofors gun. It obtained from Dutch authorities prints of drawings of the gun. These prints were made from drawings furnished by the plaintiff to the Government of the Netherlands before the German occupation. The set of prints so obtained was virtually complete, and from them the Navy was able to undertake the manufacture of the gun.
The drawings needed some changes, to adapt them for mass production, and such changes were made. The Bureau of Ordnance was not satisfied with the plaintiff’s mount for the gun, and a drastically different mount was developed. In 1941 a contractor began to manufacture the guns for the Navy. Early in 1941 the Navy obtained from a British *647 source some drawings of the Bofors gun. It made no use of these drawings because its reworking of the prints it had obtained from the Dutch gave it all the material it needed.
In 1940 the British suggested to our Army that it cause Bofors guns to be manufactured in the United States for the Army. The Army was already procuring, on a quantity basis, another gun developed by itself, but when the Navy adopted the Bofors gun, the Army did likewise. It obtained a complete set of blueprints of the gun from a company in Canada which was manufacturing the gun for the British. These were based upon drawings which had been furnished to the British Government by the plaintiff. Contracts were made early in 1941 with American manufacturers for the manufacture of Bofors guns for the United States on a quantity basis.
On January 10, 1941, while our military authorities were in the process of arranging for the manufacture of the Bofors gun, the Bureau of Ordnance of the Navy requested our naval attache in Sweden to find out what the plaintiff would charge for a license to have the Bofors gun manufactured in the United States “for use by United States forces only.” The plaintiff sent a Captain Linden to Stockholm to confer with our naval attache. After conferences, Linden returned to Bofors and came back to Stockholm with a draft of a proposed contract. This draft said “this license to be used exclusively for the requirements of the Navy of the United States of America.” Our naval attache suggested that the draft be changed because the Army might also desire to use the gun. Linden agreed that the change would be made. Our naval attache advised the Navy Department that the cost of a license, with drawings and the services of a production expert and a design engineer would be $600,000.
Exchanges of messages relating to price and time of performance and having no direct bearing on our problem took place. On June 3, 1941 the Navy Department authorized the naval attache to purchase an “irrevocable non-exclusive license to make, have made, and use in the U. S.” the Bofors gun, ammunition and mounting. The attache prepared a draft which used the language quoted above and further stated that the gun with a specified mounting was to be for *648 naval use, and the gun with a specified field carriage was for Army use. Conferences between the naval attache and Linden occurred. Linden said that the plaintiff would insist on limiting the license to manufacture for the military forces of the United States. He suggested that the wording be changed to limit the use to the Army and Navy of the United States. The naval attache said that there might be other organizations such as home defense units or air forces that would be interested in the guns.
About June 10 Linden submitted a proposed draft of contract which said that the license was to cover the manufacture of the material “in the United States for the United States forces.” The naval attache advised the Department of this language and of other terms of the proposed contract and ashed if they were acceptable. The Department replied:
* * * the terms stated are satisfactory except for the limitation as to use by United States forces. It is agreeable that license be limited to manufacture under United States contract and for United States use but not that such use be restricted to forces of the United States.
In a subsequent conference our naval attache advised Linden that the expression “for the United States forces” used in the draft was not satisfactory to the Navy, and that it had particularly specified that the use of the material manufactured under the license was not to be restricted to the forces of the United States. He suggested that the phrase “for the United States use” be substituted. There was extended discussion of what the substituted expression would mean. Linden said that the export of Bofors guns manufactured in the United States could not be allowed, as it was the plaintiff’s policy, in selling manufacturing rights, to limit such rights to the country purchasing them, except that the United Kingdom had acquired a manufacturing license for the entire British Empire.
After the conference the final draft of the contract was prepared by our naval attache and it was signed on June 21, 1941 by him and by Linden, for their respective principals. It contained the expression “for the United States use.” In the latter months of 1941 the United States began to supply other countries with Bofors guns, under its lend-lease pro *649 gram. It has, apparently, continued since that time to export these guns. The instant proceeding is, by the stipulation of the parties, limited to the question of the right of the plaintiff to recover, and hence no evidence has been taken on the question of the extent of the alleged violations.
From the above recital it will be noted that the Navy’s first inquiry was about the cost of a license to manufacture “for use by United States forces only.” The plaintiff’s draft in response said “exclusively for the requirements of the Navy.” Our attache said that the Army should be included, and the plaintiff’s agent agreed. Then for many weeks the negotiations related only to other terms of the contract. Next came our attache’s draft using the expressions “for naval use” and “for Army use” with regard to the guns with their two kinds of accessories. Linden said the plaintiff would insist that the material be limited to the use of the military forces of the United States. Our attache said it should also include home defense units, air forces, and other possible forces. Linden submitted a draft saying “for the United States forces.” Our attache submitted this to the Department, and received the reply which we have quoted. Then the language suggested in the reply, i. e., “for the United States use” was inserted, but only after a discussion in which the plaintiff’s agent made it plain that the plaintiff would not agree that the guns might be exported, and in which the agent of the United States expressed no opinion that the language used would permit export.
In no stage of the negotiation, except the final one, was there any intimation by the United States that it contemplated a license to do anything with the material manufactured, except to have it used by its armed forces. Its own first proposal was “for use by United States forces only.” Its agent was made aware of the importance which the plaintiff attached to the matter of licensing the export of its guns. When the Department’s last proposal reached our agent, it suggested language which was highly ambiguous. One needs only to read the briefs in this case to be convinced of that. The plaintiff’s agent stated, in effect, that the plaintiff would not agree to it if it were to be interpreted to mean that the license permitted export. The Government’s agent *650 did not say that it did mean that. He had no instructions from his superiors as to what it had been written to mean.
In the circumstances, the meaning which the plaintiff attached to the language is controlling. If parties are at the signing of a contract, and one.says that he will not sign except upon the understanding that the word white, when used in the contract, means black, and the other party says nothing, and they sign, probably white means white. But where one party says that the words “for the United States use,” speaking of an implement of war, does not mean to him, “for use by any nation at all, if that use will redound to the benefit of the United States,” he is properly putting his interpretation upon language which has no plain meaning, and the other party is, in all fairness, under a duty to express his views if they are different. The probability in the instant case is that our naval attache had no clear idea of what his superiors meant by the language; there was nothing in his prior communications with them which enlightened him; the negotiations had been long and tedious; and the plaintiff’s interpretation of the words, in the circumstances, was not unreasonable.
Our conclusion is that the United States did not, by the June 21,1941 contract, obtain a license to export Bofors guns and that, in the circumstances, by necessary implication, it agreed that it would not export them.
The Government says that, because it made no use of the drawings received from the plaintiff, the plaintiff cannot recover, regardless of the meaning of the contract. It is true that so much progress had been made toward the production of the Bofors gun from the data obtained from the Dutch and the British that no use was made of the drawings. The defendant suggests that it bought the license to ward off possible suits for patent infringement after the war. The plaintiff had no American patent on the gun, but it had such a patent on the field gun carriage. Also, there was a possibility that under an international convention, its Swedish patent might become retroactively effective in this country.
We think that one cannot, with full knowledge of the title of the licensor, and of all relevant facts as to whether the license is necessary or valuable, make a contract for the *651 license and then assert that the licensor had nothing to sell. The Government got what it principally desired, immunity from liability to the plaintiff for actions within the scope of the contract. It must therefore itself comply with the contract.
The plaintiff is entitled to recover, and a judgment to that effect will be entered. The amount of the judgment will be determined in further proceedings pursuant to Buie 38 (c).
It is so ordered.
LaRamore, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OE EAOT
The court, having considered the evidence, the report of Commissioner Mastin G. White, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff seeks a judgment in an unspecified amount because of damages allegedly sustained when Bofors 40 mm. anti-aircraft guns, which had been manufactured in the United States by or for the defendant subsequent to June 21, 1941, were transferred by the defendant to the governments of other nations. The plaintiff contends that such transfers were in violation of a contract dated June 21, 1941 between the plaintiff and the defendant, under which the plaintiff granted to the defendant (among other things) a license “to make, use and have made in the United States for the United States use” Bofors 40 mm. anti-aircraft guns and ammunition for such guns. [Emphasis supplied.]
THE PLAINTIFE AND ITS OPERATIONS
2. The plaintiff is a privately owned corporation, organized under the laws of the Kingdom of Sweden. It maintains its headquarters in Bofors, Sweden.
3. The Government of Sweden accords to citizens of the United States the right to prosecute claims against the Government of Sweden in its courts.
4. The plaintiff began as an iron forge in about the year 1640. It developed into a modern steel company and, about 1880, it began manufacturing guns. At all times relevant to *652 this proceeding, the plaintiff’s principal business has been the production of guns, with calibers of from 20 mm. up, and ammunition for such guns. Belated to and incidental to its principal business, the plaintiff produces quality steels and various chemical products.
5. (a) The heart of the plaintiff’s organization for the production of ordnance materiel is its design department, which designs and perfects new ordnance equipment. In 1940, the plaintiff employed approximately 300 technical personnel in the design department.
(b) In addition to its design department, the plaintiff operates its own steel plant, chemical works, mechanical workshops, proving ground, and laboratory.
(c) The development of a new gun by the plaintiff, from the drafting-board stage to a finished production model, usually requires a period of from five to eight years.
6. (a) After developing ordnance materiel, the plaintiff manufactures and sells such materiel to some countries and it grants to other countries licenses authorizing the licensees to manufacture such materiel themselves or to have it manufactured by industrial concerns within their borders. In some instances, the plaintiff has sold to a government ordnance materiel manufactured by the plaintiff and, in addition, has issued to the same government a license authorizing the manufacture of ordnance materiel by or for the licensee.
(b) When a country is licensed by the plaintiff to manufacture ordnance materiel developed by the plaintiff, the plaintiff customarily supplies the drawings, the “know-how”, and the technical assistance necessary to enable the licensee to manufacture such equipment.
DEVELOPMENT OE BOEORS 40 MM. GUN
7. (a) In response to requests from the Swedish Navy, the plaintiff commenced work in the period 1925-1927 on the development of a modern anti-aircraft gun. Initially, the design work was directed toward the development of a 20 mm. gun, but it was concluded that the projectile of a 20 mm. gun could not carry an explosive charge sufficiently powerful to bring down an airplane with one shot. Consequently, it was decided that the development work should be directed toward *653 a 40 mm. weapon. Sucli work was commenced in 1928. Various alternative solutions of the problems of the automatic mechanism were designed, and prototypes were built, tested, and discarded until about 1933, when the naval version of the Bofors 40 mm. L-60 gun was finally perfected. Thereafter, the work was directed toward the development of a field version of the 40 mm. L-60 gun on a mobile carriage, which was finally completed in 1934. The naval and field (or army-type) versions of the gun were similar except for the mounts.
(b) The Bofors 40 mm. L-60 gun was an excellent weapon. It combined a high rate of fire with a high muzzle velocity, in comparison with other guns that had been designed for similar purposes, and it was relatively simple to operate and maintain.
8. The only patent obtained by the plaintiff in the United States on any part of the Bofors 40 mm. L-60 gun is numbered 2103670 and covers the field carriage for the field (or army-type) gun.
9. (a) The plaintiff undertook a vigorous campaign for the commercial exploitation of its new 40 mm. L-60 gun. Primarily, the plaintiff sought to produce in its own factories finished weapons and sell them to various governments, thus furnishing employment for its approximately 8,000 employees. Prior to 1941, the plaintiff pursued this line of exploitation by selling finished 40 mm. L-60 guns to the governments of Argentina, Austria, Belgium, Denmark, Egypt, Esthonia, Finland, France, Greece, Holland (see finding 10), Norway, Poland, Portugal, the United Kingdom (see finding 11), and Yugoslavia. Since the end of World War II, the plaintiff has sold approximately 450 finished 40 mm. L-60 guns to Argentina, Australia, Brazil, Burma, Egypt, Indonesia, Pakistan, Thailand, and Venezuela.
(b) Due to the limitations on the plaintiff’s production capacity (the plaintiff sought to reach a level of from 20 to 25 guns per month, but seldom attained that goal), a second method of commercial exploitation used by the plaintiff in connection with its 40 mm. L-60 weapon was the sale of production licenses to various governments, whereby the plaintiff granted such governments the right to manufac *654 ture and use these weapons. This method of commercial exploitation was more frequently utilized in the cases of the larger powers whose requirements exceeded the plaintiff’s production capacity. Production licenses were sold by the plaintiff to the governments of Argentina, Austria, Belgium, Czechoslovakia, Finland, France, Hungary, Norway, Poland, the United Kingdom (see finding 11), and the United States. The record is not clear regarding the extent to which these transactions were consummated before or after June 21,1941.
(c) In some instances, the plaintiff sold finished 40 mm. L-60 guns, as well as production licenses, to countries mentioned in paragraph (b) of this finding.
10. On March 18, 1935, a contract was executed between the plaintiff and the Minister of Defense of the Netherlands, whereby the plaintiff agreed to manufacture and deliver two 40 mm. automatic twin (or 2-barreled) guns in naval mountings, together with five copies of all approved drawings. The contract provided that “The designs shall remain the property of the Supplier [plaintiff]”, and that “The Minister shall be entitled to use the drawings and descriptions delivered by the Supplier for the Navy’s restricted service manuals”. Since the date mentioned, the plaintiff has sold other 40 mm. naval guns to the Netherlands, and has supplied drawings to enable Dutch personnel to make repairs.
11. On J une 30, 1937, the plaintiff entered into a contract with the British War Office, whereby the plaintiff undertook to deliver certain finished Bofors 40 mm. field guns to the British Government and also granted the British Secretary of State for War:
(a) * * * a licence to manufacture (either in Government Factories or by contract) further equipments * * *.
(b) “In Government Factories or by contract” is to be understood to provide for manufacture by either or both of these methods in the United Kingdom, in India, and in the British Dominions. Manufacture by contract in India and in the Dominions is to be under the same conditions as obtain in the United Kingdom.
(c) The requirements of His Britannic Majesty’s Secretary of State for War are to be understood to include, in addition to the requirements of the British *655 Defence Services, the requirements of any British Dominion, Crown Colony or Mandated Territory, and also requirements for Egypt and Iraq which His Majesty’s Government may be by treaty bound to supply.
12. There is no evidence that any official of the defendant had knowledge of the terms of the Dutch contract of March 18, 1935, or of the terms of the British license agreement of June 30, 1937, at any time before partial copies of such documents were submitted in support of the plaintiff’s motion for summary judgment in this case.
DEFENDANT’S EARLY INTEREST IN BOFORS 40 MM. GUN
13. (a) The earliest overt interest by personnel of the defendant in the Bofors 40 mm. gun was exhibited in May 1937. At that time, the United States military attache in Berlin asked the plaintiff for a quotation on one 40 mm. field gun, with ammunition. The plaintiff replied that “we on principle do not sell guns and ammunition for demonstration purposes”, but that “we are prepared to carry out tests and demonstration in Bofors in the presence of the interested authorities, and we are also willing, at a later date, to discuss the eventual purchase of the licence of fabrication in the United States”.
(b) A demonstration of the Bofors 40 mm. gun was witnessed by American Army officers at Bofors, Sweden, in August 1937.
(c) A further interchange of correspondence occurred in December 1937, when the. United States military attache in Berlin requested a price quotation on Bofors 40 mm. guns in lots of 5 and 10, with ammunition. The plaintiff replied that it was unable to undertake any deliveries of guns within two years, but reiterated its willingness “to discuss the conditions of transferring to your War Departement [sic] the right of manufacture for the materials in question”, and added that “we have already sold the right of manufacture of this material to several countries in Europe”. The military attache in Berlin advised the plaintiff in June 1938 that the War Department “is not prepared to undertake purchase of a license for the manufacture of your 40 mm gun and ammunition”.
*656 14. The Bofors 40 mm. gun was brought to the attention of the Chief of the Bureau of Ordnance of the United States Navy in the fall of 1939 by a person who had seen the gun fired in Sweden. In 1940, after receiving further information concerning the gun, the Chief of the Bureau of Ordnance decided to obtain one of the guns, a mount, and some ammunition for testing purposes. Instructions relative to the procurement of the materiel were issued to the United States naval attache in Stockholm.
15. (a) Following a period of negotiation, the plaintiff and the United States Navy Department (acting through the United States Minister to Sweden) entered into a contract on July 26, 1940 for the sale by the plaintiff to the Navy Department of one Bofors 40 mm. naval gun in a twin mounting at a price of $40,000.00, and 3,000 rounds of high-explosive tracer ammunition for the gun at a price of $10.00 each. It was expressly provided in the contract (among other things) that:
This contract does not grant to the Buyer a license to manufacture the materials neither in owned factories nor by contract as it is mutually agreed upon that the gun and ammunition as per this contract will be used for proof firing and other testing purposes only.
(b) The gun, mount, and ammunition mentioned in the contract of July 26, 1940 were sent to the United States in August 1940. The gun was fired for testing purposes by the Navy at its Dahlgren proving ground in October 1940.
16. (a) While awaiting the receipt of the gun mentioned in finding 15 above, the Chief of the Bureau of Ordnance learned that a Dutch naval vessel, the Van Kinsbergen, equipped with Bofors 40 mm. guns, was in the West Indies. He dispatched two naval officers of the Bureau of Ordnance to the West Indies for the purpose of inspecting the Bofors 40 mm. guns on the Dutch ship and witnessing the firing of such guns. These officers went to the West Indies in in August 1940.
(b) On their return to Washington, the naval officers referred to in paragraph (a) of this finding made a very favorable report concerning the Bofors 40 mm. gun and its performance. However, their report concerning the fire- *657 control system used in connection with the guns on the Dutch ship was unfavorable.
DEFENDANT INAUGURATES PROGRAM FOR MANUFACTURE OF BOFORS 40 MM. GUNS
17. (a) On the basis of the report mentioned in finding 16 (b) and the test-firing of the gun mentioned in finding 15, the Bureau of Ordnance decided that it would be advisable for the United States Navy to make arrangements for the manufacture of Bofors 40 mm. naval guns instead of the 1.1-inch anti-aircraft gun theretofore developed by the Navy, as the Bofors gun was regarded as superior to the 1.1-inch weapon.
(b) The lines of action indicated in subsequent findings were thereafter followed by the Navy in getting ready for the manufacture of Bofors 40 mm. naval guns.
18. (a) The Dutch naval attache in Washington was requested to procure for the United States Navy drawings of the Bofors 40 mm. naval gun. Photoprints of drawings of the gun, and also of the mount, were obtained by the Dutch naval attache from the Dutch East Indies (Holland itself was then occupied by German military forces). The photo-prints were flown to Washington, where they were delivered to the Bureau of Ordnance of the Navy. Some of the photo-prints were in the possession of the Bureau of Ordnance in the early part of November 1940, and others were en route to Washington at that time.
(b) The photoprints referred to in paragraph (a) of this finding had been made from drawings furnished by the plaintiff to the Government of the Netherlands.
19. The Bureau of Ordnance of the United States Navy also obtained from Dutch ordnance officers sometime prior to December 20, 1940 drawings and specifications relating to ammunition for the Bofors 40 mm. gun.
20. (a) The photoprints of drawings mentioned in finding 18 above were rather small in size, the largest being approximately 5" x 7". They constituted virtually a complete set for the Bofors 40 mm. gun; and, with the modifications mentioned in subsequent findings and some improviza *658 tion, they enabled the United States Navy to undertake the manufacture of Bofors 40 mm. naval guns.
(b) It was first necessary, however, for the photoprints to be converted into full-scale drawings that could be used for the manufacture of Bofors 40 mm. guns on a mass-production basis. This task was entrusted by the United States Navy to the York Safe & Lock Company early in January 1941.
(c) In preparing the new drawings, the personnel of the York Safe & Lock Company first “blew up” the small photo-prints, and then used the blown-up prints as the basis for the preparation of the new drawings. Notations in Swedish on the photoprints were translated into English, and the dimensions, which were shown on the photoprints in millimeters, were converted to inches. In addition, it was necessary to change the type of projection that had been used in preparing the original drawings from which the photoprints were made, as the so-called European or first-angle projection had been used in preparing the original drawings and American manufacturers are accustomed to the so-called American or third-angle projection. Also, the Dutch photoprints contained notations such as “File to fit” and “Fit at assembly”, and others that called for the co-drilling of parts. Such techniques are inconsistent with American mass-production methods, under which parts are manufactured separately, and frequently by separate contractors, so they must be made in such a way that, when they come off the production line, they can be assembled and put into the mechanism without any filing or hand fitting, or can be given widespread distribution for use as spare parts that will fit readily without filing or hand fitting. In order to eliminate the necessity for filing parts or hand fitting them at assembly, it was necessary for the York Safe & Lock Company to prepare functional assembly drawings and, in some instances, to change the tolerances shown on the photoprints or to provide for tolerances where none was shown on the photoprints. Where specifications respecting the materials to be used were shown on the photoprints, such specifications were used by York; but where none was shown, York made the selection on the basis *659 of what it considered to be the necessary strength characteristics, the capacity of the metal to sustain stress, hardening properties, wearability, and machineability.
21. (a) The mount designed by the plaintiff for its 40 mm. naval gun was regarded by the Bureau of Ordnance of the United States Navy as unsatisfactory. In the plaintiff’s mount, each gun was controlled (i. e., elevated and trained on the target) manually by men utilizing cranks, whereas the Bureau of Ordnance wanted to utilize hydraulic power for elevating and training the gun. The mount developed by the plaintiff was regarded by the Bureau of Ordnance as too flimsy to permit the substitution of power drives for manual control. The Bureau of Ordnance also felt that it was necessary to provide for a central system of fire control, whereby a gun or several guns could be controlled and fired from a central point on a ship where good facilities for observation were available.
(b) The Bureau of Ordnance embarked upon a program for the design of entirely new mounts, both twin and quadruple, for the Bofors 40 mm. gun (the twin mount to carry a two-barreled gun and the quadruple mount to carry a four-barreled gun). The preliminary work in preparing the mount designs was done in the Bureau of Ordnance, and then the task of preparing the final designs and the detailed drawings was entrusted to the York Safe & Lock Company.
(c) The twin and quadruple mounts developed by the Bureau of Ordnance for the Bofors 40 mm. gun differed widely from the mount that was purchased by the United States Navy from the plaintiff (see finding 15) and from the mount depicted on the photoprints that were obtained from the Dutch (see finding 18). For example, the new mounts were much heavier than the plaintiff’s mount, they utilized power drives instead of manually operated cranks, they were two-axis mounts whereas the plaintiff’s mount was a three-axis mount, they utilized rollers instead of the ball bearings utilized in the plaintiff’s mount, and they employed additional safety devices not found on the plaintiff’s mount.
22. On February 19,1941, the Navy Department addressed to the York Safe & Lock Company a “letter of intent” that *660 asked the company to construct and equip, on land owned by it at York, Pennsylvania, a manufacturing plant that would be suitable for the manufacture, assembling, and testing of 500 Bofors 40 mm. naval guns on twin mounts and 500 Bofors 40 mm. naval guns on quadruple mounts, at the rate of 25 twin-mount and 25 quad-mount guns per month. The “letter of intent” was accepted by the York Safe & Lock Company on February 20,1941.
23. (a) After a complete set of new drawings for the Bofors 40 mm. naval gun had been completed by the York Safe & Lock Company upon the basis of converting the Dutch photoprints, the set was carried to Washington and was approved by an officer in the Bureau of Ordnance of the Navy. Approval was obtained on May 2,1941.
(b) As soon as suitable drawings were available, the York Safe & Lock Company began the manufacture of Bofors 40 mm. naval guns for the United States Navy.
24. Early in 1941, the Bureau of Ordnance of the United States Navy obtained from a British source some drawings of the Bofors 40 mm. field (or army-type) gun. However, the Bureau of Ordnance did not make any use of the British drawings, as steps had already been taken with respect to the conversion by the York Safe & Lock Company of the Dutch photoprints mentioned' in previous findings.
25. More or less contemporaneously with the steps that were taken by the Bureau of Ordnance of the United States Navy in getting ready for the manufacture of Bo-fors 40 mm. naval guns, as indicated in previous findings, the Ordnance Department of the United States Army was similarly engaged in activities looking toward the manufacture of the Bofors 40 mm. field (or army-type) gun. This program had its inception sometime in the latter part of 1940, when British military personnel suggested to the Ordnance Department that the latter have the Bofors 40 mm. field gun manufactured in the United States. The suggestion posed a serious problem for the Ordnance Department because, although it wished to cooperate with the British, the Ordnance Department was already involved in the *661 production, on a quantity basis, of a 37 mm. anti-aircraft field gun, as well as the carriage, fire-control system, and other equipment for the gun. The Ordnance Department thought that the 37 mm. gun was as good as the Bofors 40 mm. gun, and initially decided that it would not embark upon the manufacture of the Bofors gun. Shortly thereafter, the Bureau of Ordnance of the Navy, which worked very closely with the Army Ordnance Department on anti-aircraft materiel, indicated that it was going to shift from the 1.1-inch anti-aircraft gun to the Bofors 40 mm. naval gun. The matter of the manufacture of the Bofors 40 mm. field gun was then reconsidered by the Army Ordnance Department, which decided that it would manufacture the Bofors materiel for the Army. Commitments with respect to the manufacture of the 37 mm. gun were thereupon disposed of by the Army, although the manufacture of that gun was continued for a while.
26. (a) The Ordnance Department of the United States Army endeavored to obtain drawings of the Bofors 40 mm. field gun from the British Purchasing Commission in the United States, and some drawings were obtained from that source. During the holiday season at the end of 1940 and the beginning of 1941, the Ordnance Department was able to obtain a complete set of blueprints for the Bofors 40 mm. field gun from a company in Canada that was engaged in the manufacture of the gun for the British Government.
(b) The drawings and blueprints referred to in paragraph (a) of this finding had metric measurements. The notations were in English, and the drawings used the British numbering system, British metal specifications, and the British system of revision numbers. The European, or first-angle, system of projection was used.
(c) The drawings and blueprints mentioned in paragraph (a) of this finding were based upon drawings that the plaintiff had furnished to the British Government.
27. (a) The data referred to in finding 26 above were delivered to the Chrysler Corporation at Detroit, Michigan, *662 early in January 1941, and an agreement was made between the Army Ordnance Department and the Chrysler Corporation whereby the latter was to convert such data into a new set of drawings that could be used for the manufacture of Bofors 40 mm. field guns on a mass-production basis. This involved (among other things) the conversion of the measurements from the metric system to inches, changes in projection, and the application of new standards of dimensioning and tolerances. In addition, Chrysler was to manufacture two pilot Bofors 40 mm. field guns. These arrangements were incorporated in a “letter of intent”, which was issued by the War Department on January 24, 1941 and was accepted by Chrysler on February 3,1941.
(b) The job of converting the drawings mentioned in paragraph (a) of this finding was completed by the Chrysler Corporation in March 1941.
(c) The Chrysler Corporation began the manufacture of the two pilot guns while the preparation of the new drawings was in progress.
28. Late in 1940 or early in 1941, personnel of the Army Ordnance Department conferred with officials of the Firestone Tire & Bubber Company regarding the manufacture by Firestone of a mobile carriage for the Bofors 40 mm. field gun. On February 7, 1941, a “letter of intent” was issued by the War Department to Firestone, and was accepted by Firestone on the same day. It covered the preparation by Firestone of design drawings for a mobile carriage to transport the Bofors 40 mm. field gun, and the engineering and manufacture of two pilot carriages. The design drawings were to be based upon drawings that the Army Ordnance Department had obtained from a British source and delivered to Firestone.
29. The Chrysler Corporation was requested by a “letter of intent” dated April 16, 1941, and issued on behalf of the defendant, to acquire or construct and install additional equipment and facilities that would enable Chrysler to undertake the production of Bofors 40 mm. guns and related mechanisms (tilting parts) at the rate of 300 per month. This letter of intent was accepted by the Chrysler Corporation on April 21,1941.
*663 LICENSE CONTRACT NEGOTIATED BETWEEN DEFENDANT AND PLAINTIFF
30. On January 10,1941, while the Navy Bureau of Ordnance and the Army Ordnance Department were in the early stages of their activities looking toward the manufacture of Bofors 40 mm. naval and field guns, together with mounts and carriages for the guns, the Bureau of Ordnance sent the following message to the United States naval attache in Stockholm:
The Bureau of Ordnance desires to obtain information on the cost of license for the United States Government to have manufactured in the U S for use by United States forces only the latest type Bofors 40 millimeter water cooled AA gun and twin naval mount X [Emphasis supplied.]
Contact the Bofors Company and obtain the proposed license agreement which if it is practicable should include complete manufacturing drawings and instructions also services of at least 2 technicians one a production engineer and the other a design engineer to be sent to the States by the most expeditious transportation
A lump sum price is preferred as the Bureau contemplates making only a limited number X Inform fully regarding US patents if there are any Please expedite your reply ■
31. (a) The message dated January 10, 1941 from the Bureau of Ordnance was received by the United States naval attache in Stockholm on January 2. That same afternoon, he telephoned to Mr. Evert Wijkander, president of the plaintiff, and requested Mr. Wijkander to send an official of the plaintiff to visit the naval attache as soon as possible.
(b) Captain Oscar Linden, who was the plaintiff’s artillery director and head of the plaintiff’s war materiel section, arrived in Stockholm on January 13, 1941 for a conference with the United States naval attache. The subject of the purchase of a license by the defendant from the plaintiff was discussed by the naval attache with Captain Linden.
(c) On January 16, 1941, Captain Linden returned to Stockholm for a further conference with the United States naval attache. Captain Linden carried with him a draft *664 of a proposed contract dated J anuary 15, 1941 and a “Summary of licence agreement”.
32. (a) The proposed draft of contract mentioned in finding 31 (c) provided (among other things) that the plaintiff would grant to the United States Navy Department a license to manufacture “an unlimited number of Bofors 40 mm automatic guns in twinmountings * * * constructed * * * for water cooling of the barrels, this license to he used, exclusively for the requirements of the Navy of the United States of America * * *”. [Emphasis supplied.]
(b) In a “Summary of licence agreement” that was attached to the draft of contract, it was stated (among other things) that “The object of the agreement is a manufacturing licence for an unlimited number of 40 mm automatic guns in twinmountings, * * * for manufacture in Government factories or by contract, exclusively to he used hy the U. S. Navy”. [Emphasis supplied.]
(c) Captain Linden and the naval attache discussed the proposed draft of contract, and the naval attache suggested that the word “Navy” be eliminated from the clauses quoted in paragraphs (a) and (b) of this finding. The explanation given by the naval attache for the suggestion was that the United States Army might possibly need the same gun. Captain Linden agreed that the proposed draft of the contract should be modified so that the gun could be manufactured for and used by both the Army and Navy of the United States.
33. On J anuary 19, 1941, the United States naval attache in Stockholm sent a message to the Navy Department, the first paragraph of which stated in part as follows:
The licence cost is $600,000 includes complete working drawings and instructions also the existing tool drawings * * * [and] the services of a production expert and of a design expert engineer for the period of one year X The drawings ready in 3 to 5 months X There are no U S patents X Ammunition licence $250,000 additional
34. (a) The response of the Navy Department to the message dated January 19, 1941 from the naval attache in Stockholm was dated January 24, 1941 and stated in part as follows:
*665 A period of 8 to 5 months in the delivery of drawings is not acceptable X What is the reason for this delay and is shorter time possible X Will the drawings be worded in Swedish or in English X * * *
(b) After receiving this reply, the naval attache telephoned to Captain Linden, and the latter arrived in Stockholm on J anuary 27,1941. Information respecting the matters mentioned in the communication of January 24, 1941 was requested of Captain Linden, who conferred with his home office and thereafter visited the naval attache on January 28. On the basis of information furnished to the naval attache by Captain Linden, a message stating in part as follows was sent by the naval attache to the Navy Department on J anuary 28,1941:
* * * Can start delivery in 2 months of main drawings, and others about a month later. Can deliver blueprints in two weeks, and additional copies in an additional two weeks. Some of the drawings are in English wording, while others would be worded in Swedish with English translations. Blueprints would be worded in Swedish. The metric system is used. * * *
(c) On January 30, 1941, the Navy Department sent the following message to the United States naval attache in Stockholm:
Bequest Bofors Company to assemble complete set of blueprints immediately for 40 millimeter twin naval antiaircraft gun and mount so that they may be sent immediately m your pouch upon completion of license agreement
35. After the actions referred to in findings 30-34, negotiations between personnel of the defendant and of the plaintiff regarding a license agreement were suspended for a time.
36. (a) On April 28, 1941, the Navy Department sent to the United States naval attache in Stockholm a message stating in part as follows:
* * * It is requested that you renew negotiations on basis * * * licenses covering both naval twin and army field guns X Mountings and amun Agreement to include complete drawings shop procedure and related data to be forwarded by earliest means and services two *666 production expert engineers to arrive by 1 June 1941 in the US
(b) By means of a communication dated May 2,1941, the United States naval attache in Stockholm informed the Navy Department that its proposal of April 28, 1941 had been rejected by the plaintiff, but that the plaintiff would “accept 500,000 for the naval gun exclusive of ammunition”.
(c) In a message dated May 9, 1941, the Navy Department informed the naval attache in Stockholm that it was the intention of the communication dated April 28, 1941:
* * * to establish negotiations with the Bofors for single agreement to cover naval twin gun and mount, army field gun and carriage and the ammunition. Please get the Bofors offer including all of these items. We consider that their offer of 500 000 for the naval gun alone is in excess. * * *
(d) After negotiating further with Captain Linden and Mr. Wijkander (who at first set a price of $800,000.00, but who later reduced it to $600,000.00), the naval attache then sent a message dated May 15, 1941 to the Navy Department, stating in part that “Bofors ask $600,000 all items”.
37. In a communication dated June 3,1941 from the Navy Department to the naval attache in Stockholm, it was stated in part as follows:
You are authorized to make at once proprietary purchase of the following items from the Bofors Company:
(A) Irrevocable non-exclusive license to make, have made, and use in the O. A. the following items: naval & military guns, ammunition, and mounting of types hereinafter specified * * *. This license is to cover the Bofors 40 millimeter water cooled gun for naval use, Bofors twin mounting for same, Bofors 40 mm air cooled gun for army use, Bofors field carriage for same as covered by US patent 2103670,, and ammunition of all types for these guns. [Emphasis supplied.]
(B) Plans, manufacturing drawings, specs, and related data for all of the above mentioned types to be delivered to the Chief of the Bureau of Ordnance as [sic] Washington, D. C. as quickly as possible.
(C) The services of two expert production engineers for one year after their arrival in the United States which must not be later than August 1, 1941. A maxi *667 mum offer of $600,000.00 is authorized for all of items A,B, andC * * *.
38. (a) By means of a memorandum dated June 5, 1941, the United States naval attache in Stockholm submitted to Captain Linden a proposal for a contract under which the plaintiff would: (i) grant an “Exclusive and irrevocable license to make, use and have made in the United States” the Bofors 40 mm. water-cooled gun for naval use, the Bofors twin mounting for the 40 mm. naval gun, the Bofors 40 mm. air-cooled gun for Army use, the Bofors field carriage for the 40 mm. Army gun (as covered by United S tates patent No. 2103670), and all types of ammunition for such guns;
(ii) furnish plans, specifications, manufacturing drawings, and related data for the materiel previously mentioned; and
(iii) furnish the services of two expert production engineers for one year.
(b) On June 9, 1941, Captain Linden and the United States naval attache had a conference concerning the proposed draft of contract mentioned in paragraph (a) of this finding. Captain Linden informed the naval attache that the plaintiff would insist on limiting the license to the manufacture of the materiel for the use of the military forces of the United States. Captain Linden suggested that the portion of the contract relating to the license be modified so as to limit the use of the materiel to the Army and Navy of the United States; but the naval attache said that such a provision would be too restrictive, since there might be other organizations, such as home defense units or air forces, that would be interested in the guns.
(c) Shortly thereafter, Captain Linden submitted to the United States naval attache a proposed draft of contract that was similar to the draft mentioned in paragraph (a) of this finding, except that the license was to cover the manufacture of the materiel “in the United States for the United States forces”.
39. (a) In a communication dated June 13, 1941 from the United States naval attache in Stockholm to the Navy Department, it was stated in part as follows:
Negotiation have [sic] specified license for use by United States forces only and agreement being so drawn *668 Customary arbitration clause inserted, any arbitration to take place in Stockholm * * *. Please advise if above is acceptable. * * *
(b) The reply from the Navy Department was dated June 13,1941 and stated in part that:
* * * the terms stated are satisfactory except for the limitation as to use by United States forces. It is agreeable that license be limited to manufacture under United States contract and for United States use but not that such use be restricted to forces of the United States.
(c) In a subsequent conference between Captain Linden and the United States naval attache, the latter stated that the phrase “for the United States forces”, used in the proposed draft of contract mentioned in paragraph (c) of finding 38, was not satisfactory to the Navy Department. The naval attache was explicit in his explanation that the Navy Department had particularly specified that the use of the materiel manufactured under the license was not to be restricted to the forces of the United States. The naval attache suggested that the phrase “for the United States use” be used instead. Captain Linden agreed to this change, but there was considerable discussion as to the meaning of the substitute phrase. During the course of the discussion, Captain Linden stated to the naval attache that the export of Bofors 40 mm. guns manufactured in the United States could not be allowed, as it was the plaintiff’s policy, in selling manufacturing rights, to limit such rights to the country purchasing them, except that the United Kingdom had acquired a manufacturing license for the British Empire.
40. (a) On the basis of the understanding reached by Captain Linden and the United States naval attache in Stockholm as a result of the negotiations mentioned in previous findings, the naval attache prepared the final draft of the contract. It was signed on June 21,1941 by Captain Linden for the plaintiff and by the naval attache for the Navy Department of the United States of America.
(b) By means of the contract referred to in paragraph (a) of this finding, the plaintiff granted to the Navy Department an:
*669 Exclusive and irrevocable license to make, use and have made in the United States for the United States use, the following items:—
Military and naval guns, ammunition and mountings of types hereinafter specified * * *; said license to cover Bofors 40 mm water-cooled gun for naval use, Bofors twin mounting for 40 mm gun for naval use, Bofors 40 mm air-cooled gun for Army use, Bofors field carriage for 40 mm gun, as covered by U. S. patent number 2103670, and all types of ammunition for said guns. [Emphasis supplied.]
In addition, the plaintiff agreed in the contract to deliver to the United States Legation in Stockholm all the necessary plans, specifications, manufacturing drawings, and related data for the materiel covered by the license, together with all the existing drawings of the special operating and measuring tools used by the plaintiff in its own manufacture of the materiel covered by the license, information concerning the chemical and physical properties of the materials used by the plaintiff in the manufacture of such materiel, and all the necessary particulars concerning the plaintiff’s manufacturing methods. Also, the plaintiff agreed in the contract to furnish to the Navy Department the services of two expert production engineers for one year after the date of their arrival in the United States, which should not be later than September 1,1941.
( c) The contract required the Navy Department to pay the plaintiff the sum of $300,000.00 upon delivery at the United States Legation in Stockholm of the documents relating to the 40 mm. water-cooled gun for naval use and the twin mounting for such gun; the sum of $200,000.00 upon delivery at the American Legation in Stockholm of the remaining documents called for by the contract; and the sum of $100,-000.00 within a reasonable period of time after the arrival in the United States of the two production engineers.
(d) The contract further provided that in the event of any difficulty arising with regard to the interpretation of the contract, each contracting party was to choose one arbitrator, these two arbitrators would choose a third arbitrator, and the decision of the arbitrators should be binding upon both parties.
*670 41. (a) The documents that the plaintiff was to deliver to the United States Legation in Stockholm pursuant to the provisions of the contract mentioned in finding 40 were promptly delivered. The plaintiff was duly paid the total sum of $500,000.00 therefor, in accordance with the contract.
(b) Because of the war conditions that prevailed at the time of and subsequent to the signing of the contract dated June 21,1941, it was not possible for the plaintiff to send to the United States the two expert production engineers whose services were to be furnished by the plaintiff under the provisions of the contract. Consequently, the sum of $100,000.00 that was to be paid to the plaintiff for the services of such engineers was never paid.
42. In reporting to the Navy Department on the negotiations that preceded the signing of the contract dated June 21, 1941, the United States naval attache in Stockholm said in part that:
Although the Bofors officials were of the opinion that the U. S. Navy could not sell, give or lend to other nations articles manufactured under the contract, they evidenced apprehension over the words “for the United States use”. I believe this apprehension to be caused by the possible effect in any dealings with South American countries, particularly Argentine where Bofors now have representation.
43. (a) The drawings and other data obtained from the plaintiff pursuant to the contract of June 21,1941 were never used by the Navy or Army of the United States, or by any other agency of the defendant, for the manufacture of guns, naval mounts, field carriages, or ammunition.
(b) The conversion of the drawings into new drawings suitable for use in American manufacturing plants utilizing mass-production methods was considered to be unnecessary by agencies of the defendant, as suitable drawings for the manufacture of the Bofors 40 mm. naval and field guns, naval mounts, and field carriages in the United States had already been prepared before the data that were obtained from the plaintiff reached the United States in July or August of 1941. (See findings 18-21,23, and 26-28.)
*671 DEPENDANT’S PROGRESS IN HAVING BOFORS 40 MM. GUNS MANUFACTURED
44. The process of manufacturing and assembling two pilot Bofors '40 mm. field guns for the United States Army was completed by the Chrysler Corporation in June 1941, probably prior to the signing of the license contract between the plaintiff and the defendant on June 21,1941. The pilot guns were installed on two pilot field carriages that had been manufactured by the Firestone Tire & Rubber Company, and the guns on the carriages were then delivered to the Army on June 30, 1941. The guns were test-fired at the Army’s Aberdeen proving ground in July 1941.
45. (a) On June 20, 1941, which was one day before the license contract between the plaintiff and the defendant was signed, “letters of intent” were issued on behalf of the defendant to the Chysler Corporation and to the Blau-Knox Company, calling on these companies to manufacture large numbers of Bofors 40 mm. guns, mounts, mechanisms (tilting parts) for the guns, and extra gun barrels. The “letters of intent” were accepted by the respective companies on June 30,1941.
(b) On June 25, 1941, which was four days after the license contract between the plaintiff and the defendant was signed, a “letter of intent” was issued on behalf of the defendant to the York Safe & Lock Company, asking that company to produce Bofors 40 mm. guns and mounts on a large scale. This “letter of intent” was accepted by York on July 2, 1941. However, York was actually engaged in the production of Bofors 40 mm. guns for the defendant prior to the issuance of the “letter of intent” on June 25, 1941. (See finding 23.)
46. In August 1941, work was begun to make the parts manufactured by the York Safe & Lock Company for the Bofors 40 mm. naval gun and the parts manufactured by the Chrysler Corporation for the Bofors 40 mm. field gun interchangeable.
47. By the fall of 1941, the Chrysler Corporation was engaged in the full-scale production of Bofors 40 mm. guns. The York Safe & Lock Company did not reach the stage of *672 quantity production until sometime after the beginning of 1942.
THE PARTIES CONSTRUE THE LICENSE CONTRACT
48. In the meantime, a problem arose as to the scope of the license contract dated June 21, 1941 between the plaintiff and the defendant. On July 3, 1941, Captain Sohlman, a vice president and director of the plaintiff, and the commercial attache of the British Legation in Stockholm called on the United States naval attache in Stockholm. The British official asked the naval attache to inform the Navy Department that he approved changing the contract of June 21, 1941 so as to permit the British Empire to purchase materiel manufactured under the contract. The naval attache informed the British official that he had nothing to do with changing the contract at that time, as it was en route to Washington, and that only the Secretary of the Navy could authorize a change.
49. On July 10, 1941, the United States naval attache in Stockholm sent the following message to the Navy Department:
I understand that Bofors * * * will request United States Navy to modify clause in contract relating to “for United States use” so British may buy from United States. * * * [Naval attache] believes Bofors now concerned over legal definition of word use. * * *
50. On August 5, 1941, the United States naval attache in Stockholm sent the following message to the Navy Department:
It has been requested by Bofors that Captain Combre [sic] and the department be advised that Bofors has authorized Combre [sic] to act and conclude on their behalf any legal agreement should department wish to effect change in * * * contract * * * to permit the British to purchase material manufactured under contract for their use.
The reference in this message to “Combre” meant Captain Harvey Combe, the plaintiff’s sales representative for the British Commonwealth. He had gone to Washington for the purpose of representing the plaintiff in negotiations re *673 specting tbe acquisition by the British Government of Bofors 40 mm. guns manufactured in the United States.
51. A message dated August 9, 1941 from the Bureau of Ordnance of the Navy to the United States naval attache in Stockholm stated in part as follows:
In Bureau’s opinion no change in contract is necessary as sail [sic] of Bofors material to British not contemplated but matter has been submitted to JAG for opinion X A copy of contract has been given to Combe who is studying contract with view to determine what revisions he considers are required to cover all intended forms of United States use. * * * Desire in meantime you confirm by despatch that in accepting term “for the U S use” Bofors was cognizant of dept, specific exception to previously proposed limitation to use by “U S forces only” as set forth in * * * [message] of June thirteenth.
52. On August 13, 1941, the United States naval attache in Stockholm sent the following message to the Navy Department:
Bofors was cognizant of the departments specific exception to the previously proposed limitation to use by “United States forces only” in accepting the term “for the United States use”. * * * It is * * * [my] befief [sic] that Bofors wishes to gain the departments admission that the contract does not authorize release of material to any other government
53. A letter dated November 22,1941 from Evert Wijkan-der, the plaintiff’s president, to the British commercial attache in Stockholm stated in part that:
I confirm that if guns of this type are being or will be manufactured in the U. S. A. and delivered to the British Empire (inch Canada etc.), A/B Bofors will not make any claims either on the U. S. government or on the British against such an a,ction as long as the present war continues.
54. Quantities of Bofors 40 mm. guns were manufactured after June 21, 1941 by or at the instance of the Army and Navy of the United States. From time to time, certain of these guns were transferred by the defendant to the governments of other nations.
*674 55. Under date of December 30, 1941, an attorney representing the plaintiff wrote a letter to the Honorable Harry L. Hopkins, Lend-Lease Administrator of the United States, and stated that the plaintiff had been informed “that the United States Government is having manufactured Bofors 40 mm equipment for countries other than the United States, and that the equipment so manufactured is being supplied under the Lend-Lease Act for use by countries other than the United States of America and Great Britain”. The letter asserted that the supply of such equipment to any country other than the United States and Great Britain was in violation of the plaintiff’s rights; and it requested that instructions be issued by the Lend-Lease Administrator to the effect that “the manufacture of Bofors 40 mm equipment, and the supply of equipment so manufactured, except for the use of the United States of America and of Great Britain” should cease.
56. In response to the protest mentioned in finding 55, Harry L. Hopkins addressed the following letter to the plaintiff’s attorney:
THE WHITE HOUSE WASHINGTON
January 21,1942
Alexander Proudfit, Esquire,
64 East 86th Street,
New York, New York
Sir:
I have your letter of December 30 telling me to tell the Army and the Navy to stop manufacturing Bofors
guns for use of the United Nations in the defeat of rermany and Japan.
I can only say to you that if I had a client who asked me to do what you are asking your Government to do I should tell him to jump in the lake.
Very truly yours,
[Sgd.] Harry L. Hopkins
Harry L. Hopkins
57.(a) Sometime in 1942, the plaintiff addressed a letter to its American counsel, asking that no further steps be taken with respect to the notice previously served on the defendant to the effect that the manufacture of Bofors 40 *675 mm. guns for governments other than the United States and the United Kingdom would be regarded as in violation of the plaintiff’s rights.
(b) When the letter mentioned in paragraph (a) of this finding was written, the plaintiff did not know about the letter dated January 21, 1942 from Harry L. Hopkins to Mr. Proudfit. (See finding 56.)
58. (a) In a letter written by the plaintiff to the Secretary of the Navy on December 14, 1945 concerning the, license contract of June 21, 1941, the following statement, was made:
Having received information that material of théSé designs has been delivered by The United States to other countries, which we consider to be in violation of the conditions of the contract, it seems evident to us that we are entitled to compensation to the extent that material of this kind has been used for other purposes than those laid down in the contract. * * *
(b) Keplying to the letter mentioned in paragraph (a) of'this finding, a naval officer stated in a letter dated January 25, 1946 that the only known deliveries by the United States to other countries “of material of the design to which you refer” consisted of “transactions pursuant to the provisions of the Defense Aid Act (Public Law 11 — 77th Congress) entitled ‘An Act to Promote the Defense of the United States of America’”; and that the Navy Department regarded such transactions “as a use of the material in the defense of the United States” and “within the scope of our contract with you dated June 21,1941”.
59. The plaintiff stated in a letter dated October 14, 1946: and addressed to tire Chief of the Bureau of Ordnance of the Navy that it had been “advised that certain transactions, resulting in the transfer of Bofors equipments by the Government of the United States to countries other than Great, Britain were made pursuant to the Lend-Lease program”;: that “such transactions were dispositions of Bofors equipment not compensated for by the contract between our company and the United States Navy Department dated 21 June-1941, * * * inasmuch as the payments made under this contract did not include the export of these equipments by the- *676 United States”; and that the plaintiff was “desirous of settling our claim for compensation therefor”. The letter went on to say that the plaintiff was unable at that time to furnish a detailed statement of the amount of its claim, but requested “a fair and equitable adjustment for all guns and mounts furnished to countries other than Great Britain and its dominions”.
60. On May 23, 1947, the plaintiff (through its American counsel) again protested to the Secretary of the Navy regarding the transfer by the defendant of Bofors 40 mm. guns to the governments of other nations. The plaintiff requested that, unless the Secretary agreed with the plaintiff’s position, the matter be referred to arbitration, as expressly provided for in the contract of June 21,1941.
61. A letter dated May 28,1947 from the General Counsel of the Navy Department informed the plaintiff that its claim of October 14,1946 (see finding 59) should be considered as denied “To the extent that the claim * * * is addressed to the transfer of Bofors 40mm guns to allied countries pursuant to the Lend-Lease Act, or to the transfer of said equipment incident to the proposed transfer of naval vessels to China and the Philippine Republic”. The General Counsel expressed regret that the Navy Department could not appoint an arbitrator “in view of the absence of authority of an executive agency of the Government to consent to the resolution of disputes by arbitration”.
62. In a letter dated January 13,1950, the Secretary of the Navy denied the plaintiff’s request for royalties with respect to transfers of Bofors 40 mm. guns by the defendant to the govermnents of other countries, denied the plaintiff’s request for arbitration, and refused to promise that no more Bofors guns would be transferred to other governments.
PRIOR LITIGATION BETWEEN THE PARTIES
63. On October 5, 1950, the plaintiff commenced .civil actions in the United States District Court for the District of Columbia against the defendant and various officials of the United States Government because of the transfer by the defendant of Bofors 40 mm. guns to other governments. The district court dismissed the complaints, and the plain *677 tiff thereupon appealed to the United States Court of Appeals for the District of Columbia Circuit. The appellate court rendered its opinion and decision, affirming the dismissal of the complaints, on November 29, 1951 (194 F. 2d 145).
new VERSION OF BOFORS 40 MM. GUN DEVELOPED BY PLAINTIFF
64. (a) The plaintiff now has a 40 mm. anti-aircraft gun that is a newer model and a better model than the L-60. The new gun is designated as the L-70.
(b) The Bofors 40 mm. L-70 gun has a rate of fire which is twice that of the old L-60 gun. Also, the L-70 has a much more rapid rate of movement, horizontally and vertically, than the L-60, which makes it possible for the L-70 to be trained on fast-flying modern aircraft.
(c) The Bofors 40 mm. L-70 gun had been developed and tested, and was being offered for sale, by the end of 1948.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover. Judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38 (c).